[Cite as *State v. Smith* , 2016-Ohio-5062.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | | |
| Plaintiff-Appellee, | : | Case No. 15CA3686 | |
| v. | : | DECISION AND JUDGMENT ENTRY | |
| THOMAS O. SMITH, | : | | |
| Defendant-Appellant. | : | RELEASED: 07/22/2016 | |

APPEARANCES:

Timothy Young, Ohio Public Defender and Nikki Trautman Baszynski, Assistant State Public Defender, Columbus, Ohio for appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, Pat Apel, Assistant Prosecuting Attorney and Julie Cooke-Hutchinson, Assistant Prosecuting Attorney, Portsmouth, Ohio for appellee.

Hoover, J.

{¶ 1} Defendant-appellant Thomas O. Smith ("Smith") appeals his convictions and sentences from the Scioto County Common Pleas Court, following a jury trial. A jury found Smith guilty of multiple offenses including engaging in a pattern of corrupt activity, multiple trafficking and possession offenses, and participating in a criminal gang. The trial court sentenced Smith to an aggregate total of 40 years in prison.

{¶ 2} Here on appeal, Smith asserts five assignments of error. First, Smith argues that numerous instances of prosecutorial misconduct violated his right to a fair trial. Second, Smith contends that his trial counsel was ineffective because he failed to object to those instances of prosecutorial misconduct. Third, Smith argues that testimony from a State of Ohio ("State") expert witness and two of the State's admitted exhibits contained testimonial hearsay in violation

of his Sixth Amendment right to confront the witnesses against him. Fourth, Smith contends that the cumulative nature of the errors that occurred during his trial denied him his right to a fair trial. Finally, Smith contends that his convictions for engaging in a pattern of corrupt activity and participating in a criminal gang should have merged for sentencing as allied offenses of similar import.

{¶ 3} For the reasons discussed more fully below, we overrule Smith's first, second, third, and fourth assignments of error. Therefore, we affirm Smith's convictions. However, we agree with Smith that his convictions for engaging in a pattern of corrupt activity and participating in a criminal gang should have merged as allied offenses of similar import. Accordingly, we sustain Smith's fifth assignment of error. We remand the case for proceedings consistent with this decision.

## I. Facts and Procedural Posture

{¶ 4} On September 26, 2014, the Scioto County Grand Jury filed a superseding indictment against defendant-appellant Smith and 21 other defendants for multiple offenses. Smith was charged with the following counts: Count 1: engaging in a pattern of corrupt activity, a first degree felony, in violation of R.C 2923.32(A)(1); Count 2: conspiracy to engage in corrupt activity, a second degree felony, in violation of R.C. 2923.01; Counts 10-13: trafficking in drugs/major drug offender, first degree felonies, in violation of R.C. 2925.03(A)(2); Counts 15 and 16: trafficking in drugs/heroin, second degree felonies, in violation of R.C. 2925.03(A)(2); Count 17: possession of heroin, a second degree felony, in violation of R.C. 2925.11(A)/(C)(6)(e); Count 18: trafficking in drugs/cocaine, a first degree felony, in violation of R.C. 2925.03(A)(2) & (C)(4)(f); Count 19: possession of cocaine, a first degree felony, in violation of R.C. 2925.11(A)/(C)(4)(e); Count 27: conspiracy to traffic in heroin, a second

degree felony, in violation of R.C. 2923.01; Count 28: participating in a criminal gang, a second degree felony, in violation of R.C. 2923.42; Count 38: trafficking in drugs, a fourth degree felony, in violation of R.C. 2925.03(A)(1). Counts 10-13, 15-19, 27 and 38 were predicate events of the offenses of engaging in a pattern of corrupt activity and participating in a criminal gang.[1]

{¶ 5} The State's case against Smith proceeded to a jury trial on February 2, 2015.[2] During its case in chief, the State presented 11 witnesses. The State's theory of this case was that members of the 22nd Street Bloods, a gang from Columbus, Ohio, ran a drug trafficking operation in Scioto County. The operation included usage of a phone number that individuals would call and set up a meeting in order to purchase drugs. The State presented evidence that Smith took an active role in this drug trafficking operation.

{¶ 6} The State's first witness was Detective Robert C. Vass ("Vass") of the Columbus Police Department ("CPD"). Vass was tasked with investigating and gathering intelligence on criminal street gangs. Vass was designated as an expert witness, without objection from counsel. As a part of his duties, Vass and the other officers within the CPD classify gangs and monitor the criminal activities of their members. Vass testified that the CPD compiles a list of active and inactive members of each gang. According to Vass, if an active individual has two years of no contact with the police, then that individual is moved to an inactive classification.

{¶ 7} Vass initially testified about the general behavior of gangs and gang culture. Vass stated that most of the gangs in Columbus identify as either the Bloods or the Crips; and the gangs typically have affiliation to a specific neighborhood. Vass's testimony eventually focused on the 22nd Street Bloods. Vass identified several members of the 22nd Street Bloods, including an original member of the gang Dartangnan Hill, Smith's brother and co-defendant Orlando

---

[1] The indictment included six counts, 53 though 58, of uncharged predicate events.
[2] Smith was the only co-defendant that went to trial.

Smith, and co-defendants Troy Hines, Courtney Anderson, Kelvin Hayden, Andre Gilliam, and Ronald Fields. Vass also described the characteristics of the gang, as well as the members' use of clothing, symbols, hand gestures, tattoos and colors to show their affiliation with the gang. Vass testified that the gang generated money in two different ways— selling narcotics and committing armed robberies.

{¶ 8} During Vass's testimony, the State introduced what was referred to as a "criminal predicate statement" on the activities of the 22nd Street Bloods. According to Vass, the criminal predicate statement explains how and why the CPD believes a certain organization is a criminal street gang. The criminal predicate statement documents the gang's activities and in particular, the gang members' contacts with police officers. The criminal predicate statement is a collection of dated summaries that describe police officers' investigations of criminal activity involving members of the 22nd Street Bloods. Vass testified that the CPD keeps the criminal predicate statement in the normal course of police business. The State introduced and marked the criminal predicate statement as State's Exhibit 4. The trial court admitted the criminal predicate statement into evidence.

{¶ 9} Vass also testified that, in anticipation of trial, he prepares a "gang book" on individual defendants. The gang book shows how a specific gang member has been documented. Vass testified that in 2005, the CPD began to document Smith's criminal activities as a member of the 22nd Street Bloods. The gang book is similar to the criminal predicate statement, in that it is also a report of Smith's criminal activity associated with the 22nd Street Bloods. The gang book contains dated summaries of police investigations and investigative reports written by different CPD investigators. The State introduced the gang book on Smith and marked it as State's Exhibit 5. The trial court admitted the gang book into evidence.

{¶ 10} The State introduced and Vass testified to the multiple prior convictions of documented members of the 22nd Street Bloods. Through Vass's testimony, the State introduced the criminal history of the following co-defendants and documented members of the 22nd Street Bloods: Kelvin Hayden, Robert Charles, Troy Hines, Orlando Smith (Smith's brother), Andre Gilliam, Courtney Anderson, and Ronald Fields. The State also introduced Smith's prior convictions. Smith was convicted in four separate cases from Franklin County on offenses including possession of cocaine, possession of drugs, and having weapons under a disability. Because of those convictions, Smith was incarcerated from May 2010 to November 2013.

{¶ 11} Vass stated that he was personally familiar with Smith because he had interacted with him in the past. Vass stated that Smith went by the aliases "Bugatti Bhomas," "Gotti," and "Bhomas." Vass had also conducted surveillance on Smith. Vass opined that Smith was an active member of the 22nd Street Bloods before he was incarcerated in 2010, while he was incarcerated and after he was released in 2013. On cross-examination, defense counsel asked Vass how he could classify Smith as active during his incarceration if the CDP was not monitoring him. Defense counsel referred to Vass's earlier testimony that if a person had two years of no contact with police then that person would be classified as inactive. Vass answered that he based his conclusion on a Department of Corrections (DOC) report, obtained through the Ohio law enforcement gateway ("OLEG") that classified Smith as an active participant in a criminal gang during his incarceration. The DOC report was included in the gang book. Vass stated that the DOC would have to furnish the documentation to support that classification as the DOC, and not CPD, monitors a gang member's status during incarceration.

{¶ 12} During Vass's testimony, the State introduced photographs and videos depicting Smith's co-defendants with drugs, money, and guns. Vass identified gang members and gang

references in the pictures and videos. The State also introduced videos and photographs from Smith's social media account. The videos featured Smith performing rap music. The photographs and videos portray Smith with large sums of money and making references to the 22nd Street Bloods. The images did not indicate the exact date of posting to social media but they did show how long had passed since they were posted. Vass estimated that the images were posted in November 2013. On cross-examination, Vass indicated that he did not know the exact dates the photographs and videos were posted to Smith's social media account.

{¶ 13} Next, the State called seven witnesses who testified about Smith's involvement with drug trafficking. Many of the witnesses received something from the State in exchange for their testimony. First, Charles Sadler, a co-defendant in this case, testified that he moved to Scioto County at the end of the summer in 2012. Shortly thereafter, Courtney Anderson and Troy Hines approached him about selling heroin. Charles met with them three to four times a day to purchase one half of a gram of heroin. Charles would call the phone number 740-821-5574 to set up his purchases of drugs. Courtney Anderson and Troy Hines would also stop at Sadler's house to break up and package heroin for purchases. Charles met Smith towards the end of November 2013. Charles testified that Smith had answered his call to the 5574 phone number; and they set up a meeting in the east end of Portsmouth. Charles met Smith to buy drugs on three separate occasions.

{¶ 14} Charles's brother, William Sadler, also testified at trial. According to William, several co-defendants in this case would go to his brother's residence and "chop up" dope. William also bought drugs from Smith after calling the 5574 phone number. In addition, William testified that Smith, Courtney Anderson, and Ronald Fields assaulted him while in prison.

According to William, the incident occurred because his brother Charles was listed on the discovery for this case.

{¶ 15} Tiffany Slusher was another one of the State's witnesses. Slusher knew Smith, Courtney Anderson, Troy Hines, Ronald Fields, and others. Slusher testified that they would bring tar heroin the size of a small watermelon to prepare it for street purchases. Slusher called the 5574 phone number to set up her own purchases of heroin. Slusher saved the phone number to her phone under the name "22nd Blood Line." Slusher testified that Courtney Anderson and Troy Hines made references to each other about the gang. Slusher bought drugs through the 5574 phone number from June 2013 to March 2014. Slusher testified that she met Smith in January 2014. According to Slusher, Smith supplied her with heroin on three occasions. Slusher would pay Smith "through sex."

{¶ 16} Michael Blackburn also testified on behalf of the State. Blackburn bought drugs from Smith and the other co-defendants from October 2013 to March 2014. Blackburn stated that he called a number in order to set up a purchase; however, he did not identify the 5574 phone number. Blackburn testified that he bought from Smith about five to ten times.

{¶ 17} State witnesses Jennifer Medve and Stephanie Nuckols testified that they observed Smith and some of the co-defendants in this case preparing heroin for street buys. Medve testified that Smith and several of the co-defendants came to the residence, where she was living at the time with a boyfriend, in order to prepare black tar heroin for purchasing. Medve testified that they would hit a large size portion of the black tar heroin with a hammer, breaking it into smaller pieces. Then, they would weigh the heroin and put it into individual bags.

{¶ 18} Nuckols, a co-defendant in this case, met Smith and Troy Hines in Portsmouth around the end of 2013. Nuckols testified that Smith asked her if she "messed around" with drugs. Smith gave her the 5574 phone number. That same day, Nuckols called the phone number and purchased black tar heroin and crack cocaine. Nuckols also purchased heroin from co-defendants Orlando Smith, Troy Hines, Courtney Anderson, Kelvin Hayden, Ronald Fields and Jason Turner by calling the 5574 phone number. Nuckols testified that she would most often buy drugs from Troy Hines and Smith. Nuckols also testified that she witnessed Smith and Troy Hines prepare a large chunk of black tar heroin for street purchases.

{¶ 19} Sarah Schuman also testified as a witness for the State. Schuman testified that she first met Smith and co-defendant Kelvin Hayden at a Portsmouth bar, when a friend of hers bought heroin. Schuman testified that Smith, co-defendants Jason Turner, Courtney Anderson, and others came to her house from March until June 2014 to prepare drugs for street purchase. During this time, Schuman had been in contact with Detective Sergeant Josh Justice. It was revealed during cross-examination that Schuman had been a confidential informant for local police in exchange for monetary payment.

{¶ 20} Schuman testified that on June 9, 2014, Smith arrived at her house with co-defendants Vernita Williams, Orlando Smith, and Ronald Fields. According to Schuman, Smith and Fields went into her house and cut up heroin. As the four individuals left Schuman's residence, Schuman called Justice. Schuman informed Justice about the car's description, the tag number, and the car's occupants. Police would later stop the vehicle.

{¶ 21} The next day, Josh Turner showed up at Schuman's house. Schuman testified that he needed to use her phone. Turner needed to change the 5574 number to a new phone, since police confiscated the old one during the traffic stop on June 9, 2014. Schuman testified about

other co-defendants continuing to sell drugs after the arrests made on June 9, 2014 and June 10, 2014.

{¶ 22} Sergeant John Koch and Detective Jodi Conkel testified regarding the June 9, 2014 traffic stop and Smith's subsequent arrest. Koch testified that Smith was sitting in the back passenger seat; Vernita Williams was driving; Ronald Fields was in the back driver seat; and Orlando Smith was sitting in the front passenger seat. After police stopped the vehicle, a canine conducted a sniff of the vehicle and alerted to the presence of drugs. After all the vehicle's occupants were taken back to the Scioto County jail, Koch interviewed Orlando Smith. Koch also testified that he photographed Smith's tattoos. On cross-examination, Koch stated that no dope was found on Smith during the traffic stop.

{¶ 23} Conkel testified that she was "brought in" to search Vernita Williams. Conkel testified that Vernita Williams voluntarily removed drugs from her vaginal cavity. Conkel also testified that Vernita told her that the drugs belonged to Smith. According to Conkel, Vernita said that "Mr. Smith" threw the drugs to her to hide them. Conkel testified that she believed Vernita was referring to Thomas Smith, the defendant-appellant, and not Orlando Smith.

{¶ 24} The State's final witness was Detective Sergeant Josh Justice of the Portsmouth Police Department. Justice is a member of the Southern Ohio Drug Task Force. Justice testified that his investigation into drug activity involving members of the 22nd Street Bloods began in 2011. Justice first investigated co-defendants, Andre Gilliam and Ronald Field, in 2011. Justice testified that the Portsmouth Police Department monitored gang activity and worked with the Columbus Police Department, mentioning specifically Detective Vass. Justice testified that in 2013, law enforcement learned through another one of the State's witnesses, Michael Blackburn

that a criminal street gang was using the phone number 740-821-5574 to set up drug purchases in Scioto County.

{¶ 25} Justice gathered intelligence from other law enforcement to get information from traffic stops involving Andre Gilliam, Orlando Smith, Brittanee Baker, Troy Hines, Ronald Fields, John Kullum, and Courtney Anderson. Justice learned that these individuals were involved in traffic stops where small amounts of marijuana were discovered. Justice testified that police began to put together a group of individuals, associated with the 22nd Street Bloods, operating in Portsmouth, Ohio. From there, Justice interviewed a confidential informant in January 2014 and Jennifer Medve in February 2014. Justice set up a wired purchase, where Medve bought drugs from Courtney Anderson. In setting up the buy, Courtney Anderson answered a call to the 5574 phone number. Thereafter, Justice obtained a subpoena of the phone records from the 5574 phone number. The phone records showed that from January 1, 2013 to June 15, 2014 the 5574 phone number had a total of approximately 111,000 incoming calls and 28,000 outgoing calls.

{¶ 26} Justice testified regarding the major arrests of the co-defendants in this case. On June 9, 2014, on information from Sarah Schuman, a State's witness in this case, police completed a traffic stop of a vehicle containing Smith along with co-defendants Vernita Williams, Orlando Smith, and Ronald Fields. A police canine alerted to the presence of drugs on the vehicle. The police located crack cocaine and heroin on Vernita Williams, along with crack cocaine on Orlando Smith. Police confiscated several phones from the traffic stop as well. Justice testified that a black Motorola, claimed by Smith, was the deal phone with the 5574 number. The next day, on June 10, 2014, Justice received a request for a canine after a fellow officer had stopped a vehicle occupied by Keguan Skinner-Byrd and Courtney Anderson. Police again

seized drugs and cell phones from the vehicle. Two phones seized during that traffic stop were registered with the 5574 phone number. However, only one was active. On July 1, 2014, police stopped a vehicle driven by Jason Turner. Sarah Schuman had once again supplied information to Justice that led to the traffic stop. From the stop of Turner, police seized drugs and three cellphones, one of which was registered with the 5574 phone number.

{¶ 27} Smith testified as the only defense witness. Smith stated that he became an official member of the 22nd Street Bloods when he was 15 years old. Smith testified about his upbringing and his family's involvement with the gang. Smith's uncle was Dartangnan Hill, an original member of the gang. Smith's younger brother, Richard, was also a gang member. Smith was incarcerated from 2009 until November 2013 because of convictions of having weapons under disability and possession of drugs. Smith testified that while he was an active gang member in 2009, the death of his younger brother Richard and his incarceration motivated him to leave the gang life. According to Smith, his departure from the gang resulted in beatings from other gang members while in prison. Smith testified that these fights led to infractions on his prison record.

{¶ 28} After his release from prison, Smith became a promoter at a club named Rachel's. Smith would receive payment from the club under the table as he testified that he could not provide W-2s from his work there. Smith testified that he tried to convince his brother Orlando to move back to Columbus with him. A CPD officer had shot Orlando while Smith was incarcerated. However, Orlando continued living in Portsmouth. Smith testified that he made trips to Portsmouth to check on Orlando. During his trips to Portsmouth, Smith went to bars in town and met several woman including Tiffany Slusher, Stephanie Nuckols and Sarah Schuman. Smith testified that he developed a relationship with Schuman.

{¶ 29} Smith denied selling drugs to either Stephanie Nuckols or Tiffany Slusher. Smith also denied going into Sarah Schuman's house to chop up heroin. Smith did testify that he went over to her house with Ronald Fields that day, but Smith insisted it was only to pursue his relationship with her. Smith testified that he did not claim the "dope phone" during the June 9 traffic stop. Smith denied ever having anything besides marijuana in his possession while he was in Scioto County. Smith also testified that he did not participate in the gang while he was in Scioto County.

{¶ 30} At the conclusion of the trial, the jury returned guilty verdicts for all but two of the indicted counts.[3] For Count 1, engaging in a pattern of corrupt activity, the trial court sentenced Smith to 7 years in prison. The trial court merged Count 2 with Count 1. For Count 11, trafficking in drugs/heroin/major drug offender, the trial court sentenced Smith to 11 years in prison. For Count 12, trafficking in drugs/heroin/major drug offender, the trial court sentenced Smith to 11 years in prison. For Count 13, trafficking in drugs/heroin/major drug offender, the trial court sentenced Smith to 11 years in prison. For Count 16, trafficking in drugs/heroin the trial court sentenced Smith to 36 months in prison. The trial court merged Count 17 with Count 16. For Count 18, trafficking in drugs/cocaine, the trial court sentenced Smith to 10 years in prison. The trial court merged Count 19 with Count 18. The trial court merged Count 27 with Count 11. For Count 28, participating in a criminal gang, the trial court sentenced Smith to 8 years in prison. Finally, for Count 38, trafficking in drugs, the trial court sentenced Smith to 12 months in prison. The trial court ordered the sentences for Counts 11, 12, and 13 to run concurrently with each other, but consecutively to the sentences for Counts 1, 2, 16, 17, 18, 19,

---

[3] The State did not submit Count 10 to the jury. The jury returned an unsigned verdict form for Count 15.

27, 28, and 38. Thus, the trial court sentenced Smith to an aggregate total of 40 years in prison

with 38 of those years being mandatory.

{¶ 31} Smith then filed this timely appeal.

## II. Assignments of Error

Assignment of Error I

Thomas's right to a fair trial was violated by a plethora of prosecutorial

misconduct. * * *[4]

Assignment of Error II

Trial Counsel was ineffective. * * *

Assignment of Error III

Thomas's Sixth Amendment right to confront the witness against him was

violated. * * *

Assignment of Error IV

The cumulative nature of the errors that occurred during Thomas's trial, as

presented within Assignments of Error I, II, and III, denied Thomas his right to a

fair trial and due process of law. * * *

Assignment of Error V

The trial court erred in sentencing Thomas.* * *

## III. Law and Analysis

### A. Assignment of Error I − Prosecutorial Misconduct

{¶ 32} In his first assignment of error, Smith asserts that multiple instances of

prosecutorial misconduct denied him of his right to a fair trial.

---

[4] We have eliminated Smith's cites to the law and the record from his assignments of error, as indicated by the ellipses.

{¶ 33} "The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether the rights of the accused were materially prejudiced." *State v. Leonard*, 4th Dist. No. 08CA24, 2009-Ohio-6191, ¶ 36, citing *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45. "The 'conduct of a prosecuting attorney during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial.' " *Id.*, quoting *State v. Givens*, 4th Dist. No. 07CA19, 2008-Ohio-1202, ¶ 28, in turn quoting *State v. Gest*, 108 Ohio App.3d 248, 257, 670 N.E.2d 536 (8th Dist.1995). "Prosecutorial misconduct constitutes reversible error only in rare instances." *State v. Edgington*, 4th Dist. No. 05CA2866, 2006-Ohio-3712, ¶ 18, citing S*tate v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993). "The 'touchstone of analysis * * * is the fairness of the trial, not the culpability of the prosecutor. * * * The Constitution does not guarantee an "error free, perfect trial." ' " (Alterations sic.) *Leonard* at ¶ 36, quoting *Gest* at 257.

{¶ 34} As an initial matter, we note that Smith did not object to some of the alleged instances of prosecutorial misconduct. Failure to object to an alleged error waives all but plain error. *State v. Keeley,* 4th Dist. Washington No. 11CA5, 2012-Ohio-3564, 2012 WL 3194355, ¶ 28. "Notice of Crim.R. 52(B) plain error must be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Rohrbaugh,* 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, ¶ 16; *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "To find plain error, we must be able to say that, but for the alleged error, the outcome of trial clearly would have been otherwise." *Id.,* citing *State v. McCausland,* 124 Ohio St.3d 8, 2009-Ohio-5933, 918 N.E.2d 507, ¶ 15; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 50.

**1. The State did not improperly shift the burden of proof to Smith.**

{¶ 35} Smith claims that the State improperly shifted the burden of proof to the defendant. Smith did not make an objection to the State's conduct at trial. Accordingly, we will review these claims for plain error.

{¶ 36} First, Smith asserts that during its cross-examination, the State attacked his invocation of the presumption of innocence. Smith cites the following testimony:

[Prosecutor]:   So, it doesn't make any difference whether you're active or inactive?

[Smith]:        It does.

[Prosecutor]:   It may to you.

[Smith]:        Because I'm not - - I'm not guilty until proven innocent, sir. The charge is a charge. I'm not convicted of that charge. I'm guilty - - I'm innocent until proven guilty.

[Prosecutor]:   That's what you say.

{¶ 37} After a review of the trial transcript, Smith cited to just a portion of the testimony. The State began this particular line of questioning by asking Smith about the statement he gave to police on June 9, 2014. In the statement, Justice wrote that Smith had said that he was "a member of the 22nd Street Bloods Gang." During its cross-examination of Smith, the State asked Smith if, in the statement, he admitted to being a member of the 22nd Street Bloods. Smith replied that he told Justice that he was an inactive member. The State continued to ask Smith whether it made any difference if he was an inactive or active member. Then the cited testimony occurred.

{¶ 38} Smith claims that the prosecutor's words attacked his invocation of the presumption of innocence. However, "[i]solated comments by a prosecutor are not to be taken

out of context and given their most damaging meaning." *State v. Jackson*, 4th Dist. Pickaway

No. 11CA20, 2012-Ohio-6276, ¶ 48, quoting *State v. Carter*, 89 Ohio St.3d 593, 603, 734

N.E.2d 345 (2000). Given the context of the testimony regarding Smith's statement the comment

does not appear to be an outright challenge of Smith's presumption of innocence but the State's

response to the ongoing testimony about what exactly Smith had said in the June 9, 2014

statement. For those reasons, we do not find that the prosecutor's statement rose to the level of

prosecutorial misconduct.

{¶ 39} Next, Smith claims that the prosecutor shifted the burden of proof during closing

arguments by stating the following:

[Prosecutor]:  You heard the State's case and you put that in one hand. You hear

the State's case, and then you weigh that. Typically, when you hear

the State's case the scales of justice tip that way, because you hear

one side of the case. Then you hear the defendant's side of

the case and then do they tip back. Do they tip back or do they

stay there? And that's up to you to decide, the weight of the

case, the weight of the evidence in the case.

\* \* \*

What corroborates what he just said? You know they're going to

come up and say nothing corroborates what the State says,

but, oh, that doesn't apply to him, he can read the Wall Street

Journal. No, folks, this an open case [sic], and there's an open door

back there. They can bring in whoever they want. What do they

> do? Do they bring in any of these witnesses? They accuse the State
>
> of not doing that. Did he, no. No it's a two way street.
>
> * * * when you weigh it, there's nothing against it. Scales go like
>
> that. There's nothing in there to bring the Defendant's - - the
>
> scales back for the Defendant. They offered nothing.

Smith argues that the prosecutor's comments were "egregiously misleading." Further, Smith

contends that the comments misled the juror into believing that he had to produce corroborating

evidence, witnesses, and explanations and if he did not, he should be found guilty.

{¶ 40} This Court previously set forth in *Wellston v. Horsley,* 4th Dist. Jackson No.

05CA18, 2006-Ohio-4386, the standard that applies when evaluating claims that the prosecutor

engaged in misconduct during closing argument:

> During closing arguments, the prosecution is given wide latitude to convincingly
>
> advance its strongest arguments and positions. *See State v. Phillips* (1995), 74
>
> Ohio St.3d 72, 90, 656 N.E.2d 643; *Treesh*, 90 Ohio St.3d at 466. Nevertheless,
>
> the prosecutor must avoid going beyond the evidence presented to the jury in
>
> order to obtain a conviction. See, e.g., *State v. Smith* (1984), 14 Ohio St.3d 13, 14,
>
> 470 N.E.2d 883. "[P]rosecutors must be diligent in their efforts to stay within the
>
> boundaries of acceptable argument and must refrain from the desire to make
>
> outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears*
>
> (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136.

*Wellston* at ¶ 21.

Also, "[i]t is not improper for the prosecution, in closing, to point out the lack of evidence

supporting the defense theory of the case." *State v. Jackson*, 8th Dist. Cuyahoga No. 76141, 2000

WL 426556, *11 (April 20, 2000), citing *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). "The prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case." *Williams* at 20, citing *Lockett v. Ohio*, 438 U.S. 586, 595, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *State v. Lane*, 49 Ohio St.2d 77, 86, 358 N.E.2d 1081 (1976).

{¶ 41} After reviewing the prosecutor's remarks during closing arguments, we do not find that the remarks were improper. In context, the prosecutor was discussing the weight of the State's witnesses and challenging Smith's testimony. The prosecutor did not go beyond the wide latitude the parties enjoy during closing arguments. *See Wellston* at ¶ 21. Accordingly, we do not find that the prosecutor's arguments improperly shifted the burden of proof.

## 2. The State did not misrepresent evidence to materially prejudice Smith's right to a fair trial.

{¶ 42} Next, Smith argues that on two separate occasions the State misrepresented evidence. First, Smith alleges that the State misrepresented evidence during the State's cross-examination of his testimony. The State asked Smith about his working relationship with a bar named Rachel's. On direct examination, Smith testified that he hosts and promotes parties for the bar. Smith admitted that the bar paid him under the table and that he did not have any W-2s that would demonstrate the income. Smith cites to the following testimony in his claim that the State misrepresented evidence:

[Prosecutor]: Parties have nothing to do with Rachel's, do they?

[Smith]: Yes.

[Prosecutor]: No, you come and you bring your gang in there and you provide security in there during that time that others come.

Defense counsel objected to the State's statement. The trial court overruled defense counsel's objection citing the latitude of cross-examination. The State's questioning continued as follows:

> [Prosecutor]:   You heard Vass testify the other day?
>
> [Smith]:        Yes, sir.
>
> [Prosecutor]:   Okay. And you heard him say that this is a common thing to take these flyers and put them up in bars or take the gangs to the bars and have - - throw a party and it doesn't have anything to do with the bar?
>
> [Smith]:        No, sir. I never heard him say that at all. I never heard him talk about any parties or flyers at all, sir.

Smith contends that the State knowingly misrepresented Vass's testimony in order to introduce into evidence that his business was not legitimate.

{¶ 43} After a review of the record, Vass did not testify that the gang threw parties in clubs and "it doesn't have anything to do with the bar." Vass did testify that the gang members would frequent a nightclub known as Club Visions, particular on Thursday nights. Also, Smith did testify about his promoting business during direct examination. Therefore, the State's initial question was not improper. However, it was improper for the State to ask its follow up question that referenced testimony that did not occur.

{¶ 44} Nevertheless, we do not find that the State's question materially prejudiced Smith's right to a fair trial. Before the State asked its initial question pertaining to the gang providing security to the bar, Smith had already stated that he did not receive any W-2s for his work as a promoter. Therefore, the notion that Smith's business was not legitimate was already presented to the jury before the State's questions. Also, the State moved on from the question

and continued asking independent questions about Smith's business. Accordingly, considering the context here, we do not find that the State's question resulted in prosecutorial misconduct.

{¶ 45} Smith also alleges that the State misrepresented evidence during closing argument. Smith argues that the State mischaracterized his testimony regarding his brother, Orlando Smith. Smith cites the following arguments made by the State during closing arguments: "Even if you decide you believe that this man came down here to protect his brother, providing security for a guy you know is slinging dope all over Scioto County, is [sic] called aiding and abetting and trafficking in drugs. I hate to say it, but that's the truth."

{¶ 46} In support of his argument, Smith cites to his own testimony regarding his brother Orlando:

[Prosecutor]:   Let me ask you this. How - - how are you going to save your brother?

[Smith]:        I mean, as - - as hard as I can. As - - as much as I can - - as much as I can beat in his ear, like Bro, this is - - we don't got to do this. I got something else. I'm doing something. Like, I'm making money. We don't - - you don't got to kick it with these guys. Like, as much as I can beat it in his head and try to get him to realize that he shouldn't be doing this, I'm going to try to do that. This is my brother. This is all I have left. I'm going to give my all in order to save my father figure.

Smith contends that it was improper for the State to mischaracterize his testimony in such a way that suggests he admitted to providing security for Orlando and then to use that admission as evidence of aiding and abetting.

{¶ 47} In response to this argument, the State argues that the evidence supported the closing arguments. According to the State, the testimony demonstrated that Smith made hundreds of hand to hand sales to seven different witnesses from the time he came to Scioto County in November 2013 until his arrest on June 9, 2014.

{¶ 48} Smith did not object to the State's arguments; therefore, we will review this claim for plain error. Here, Smith is correct in pointing out that he did not testify that he was providing security for his brother. However, Smith did testify that he knew his brother and some of the other co-defendants in this case were bringing drugs from Columbus to Portsmouth. Therefore, the prosecutor did partially misrepresent Smith's testimony. Examining the State's arguments in context, however, we do not find that the prosecutor went beyond the wide latitude allowed during closing arguments to materially prejudice Smith's right to a fair trial. *See Wellston*, 2006-Ohio-4386 at ¶ 21. Therefore, we do not find that the State's argument constituted prosecutorial misconduct.

{¶ 49} Lastly, Smith claims that the State misrepresented evidence during closing argument when a prosecutor told the jury that Smith was "determined by the Department of Corrections to be active while incarcerated." Smith asserts that this statement is not true. Smith avers that Vass was unable to explain how the DOC determines a prisoner's classification after they are released.

{¶ 50} During his direct examination by the State, Vass testified that the gang unit within the DOC sends the CPD intelligence reports of any activity of documented gang member that are incarcerated. During Smith's cross-examination of Vass, he testified that a DOC report listed Smith as an active gang member. The DOC report was admitted into evidence as part of the gang book. There was extensive cross-examination and redirect examination with Vass on this issue.

Vass admitted that his own opinion that Smith was an active gang member was based upon the DOC report. Therefore, the State's argument was within the scope of the evidence. *See Wellston*, at ¶ 21 Accordingly, we do not find that the State's comments during closing argument were improper.

### 3. The State did not improperly vouch for its own witness.

{¶ 51} Next, Smith contends that the State improperly vouched for a crucial witness. Smith argues that during the State's redirect examination of Sarah Schuman, it improperly "invoked the imprimatur of the court to increase [Schuman]'s credibility." The relevant testimony was as follows:

[Prosecutor]:   You've testified against heroin traffickers in this county before?

[Schuman]:    Yes.

[Prosecutor]:   The one out here where they had to stop traffic and arrested three of them coming from Cincinnati?

[Schuman]:    Yes.

[Prosecutor]:   And you testified in that case?

[Schuman]:    Yes, I did.

[Prosecutor]:   Okay. Judge Harcha made a ruling in that case about your credibility, didn't he?

[Schuman]:    Yes, he did.

[Prosecutor]:   And he said you were a most credible witness?

[Schuman]:    Yes, he did.

The State referenced this testimony during closing arguments by stating that Schuman had "been declared by other courts to be reliable."

{¶ 52} Smith did not object to the State's line of questioning, thus we review this claim of misconduct for plain error. Smith claims that a court may not be used to vouch for a witness's credibility. According to Smith, Schuman's testimony was crucial, as it directly conflicted with his own testimony. Smith claims that the prosecutor's actions were unacceptable, contributed to the jury's credibility assessment, and thus affected the outcome of the trial.

{¶ 53} In rebuttal, the State claims that Schuman was vigorously questioned about her motives for contacting the police, why she was not indicted, about getting paid by police, and about her general integrity and veracity during cross-examination. The State also asserts that Smith's citation to the closing arguments omits the context to the prosecutor's comments. Specifically, the State cites to its closing argument and adds emphasis as follows:

[Prosecutor]:  You heard the testimony from both Sarah Schuman and Sergeant Justice that Schuman is a reliable confidential informant. She's testified in court before. She's been declared by other courts to be reliable. *But that's your decision in here. You decide whether she's reliable.*

The State contends that its questions and closing arguments are fair comment on the questions asked by Smith.

{¶ 54} "A prosecutor does not improperly vouch for a witness's credibility by arguing, based upon the evidence, that a witness was 'a reliable witness to the simple events she witnessed, that she lacked any motive to lie, [or] that her testimony was not contradictory.' " *State v. Reine*, 4th Dist. Scioto No. 06CA3102, 2007-Ohio-7221, ¶ 63, quoting *State v. Green*, 90 Ohio St.3d 352, 373-374, 738 N.E.2d 1208 (2000). "Furthermore, a prosecutor's statement on witness credibility is not an improper voucher if it neither implies knowledge of facts outside the

record nor places the prosecutor's personal credibility at issue." *State v. Keene*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998). "A prosecutor may argue facts in evidence to support a witness's credibility and may respond to defense attacks on the witness's credibility and mental abilities." *Id.*, citing *Green* at 374; *State v. Woodard*, 68 Ohio St.3d 70, 76, 623 N.E.2d 75 (1993).

{¶ 55} Here again, because Smith did not object to the State's question or its closing arguments, we must decide if the State's conduct constituted plain error. The prosecutor posed a question to Schuman; and Schuman provided an answer to the question. Smith did not object to the question at trial. Because the prosecutor did not express a personal voucher, we are unable to find that the question constituted prosecutorial misconduct. Examining the prosecutor's arguments during closing, again, there is no personal voucher to Schuman's credibility. Instead the prosecutor invoked the prior testimony of Justice and Schuman. Therefore, we do not find that the State's argument went beyond the wide latitude afforded to parties during closing arguments. *See Wellston*, 2006-Ohio-4386 at ¶ 21. Furthermore, the State argued to the jury that it was their choice whether to find Schuman credible or not. Also, Smith's cross-examination of Schuman focused heavily on her credibility and motive for testifying. Accordingly, for those reasons, we do not find that the State's question to Schuman and its corresponding closing arguments resulted in prosecutorial misconduct.

**4. The State did not improperly express personal opinions that materially prejudiced Smith's right to a fair trial.**

{¶ 56} Next, Smith contends that the State improperly expressed personal opinions about his guilt and used the power of the prosecutor's officer to "elevate the credibility of their witnesses." Also, Smith argues that the State inappropriately referenced Smith's co-defendants'

guilty pleas. Smith did not object to the State's statements; thus, we will review these claims of misconduct for plain error.

{¶ 57} Prosecutors " 'may not express their personal beliefs or opinions regarding the guilt of the accused.' " *State v. Marcum*, 4th Dist. Gallia No. 12CA6, 2013-Ohio-5333, ¶ 63; quoting *State v. Topping*, 4th Dist. No. 11CA6, 2012-Ohio-5617, ¶ 85; in turn quoting *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "While it is improper for a prosecutor to state that the defendant is a liar or that he believes the defendant is lying, a prosecutor may suggest that the evidence demonstrates the defendant is lying, scheming, or has ulterior motives." *State v. Irwin*, 7th Dist. Columbiana No. 11-CO-6, 2012-Ohio-2704, ¶ 116, citing *State v. Kroger*, 12th Dist. Clermont No. CA99-05-050, 2000 WL 342130, *2 (Apr. 3, 2000).

{¶ 58} First, Smith contends that the prosecutor's remarks that his testimony was "a sack of bologna" "conveyed to the jury that the State knew [Smith] was lying and was guilty even if the evidence they were able to present was minimal or unpersuasive." At the beginning of the State's cross-examination of Smith, the relevant testimony was as follows:

[Prosecutor]: Are you going to look at this jury and tell them that you just said for the last 45 minutes was anything close to the truth?

[Smith]: Yes, sir, just like I have for the last 45 minutes.

[Prosecutor]: You're telling this jury that what you said for the last 45 minutes wasn't a sack of bologna to get you out of something that you got yourself into?

[Smith]: Yes, sir, That's exactly what I'm telling the jury, that none of this was a sack of bologna.

[Prosecutor]:   It's a sack of bologna. All right. Now you talked about and gave us

a part of your family like, and you said Dartangnan Hill was you

uncle?

* * *

{¶ 59} The State's comments were improper. The prosecutor made the remarks at the

beginning of his cross-examination, essentially stating his opinion that Smith's testimony during

direct examination was not the truth. During his testimony, Smith denied most of the testimony

provided by the State's witnesses. Therefore, the jury was aware of the direct conflict between

the testimony of the State's witnesses and the testimony of Smith. Accordingly, even though we

find that the State's comments were improper, we do not find that the prosecutor's remarks

materially prejudiced his right to a fair trial, nor affected the outcome of the trial resulting in

plain error.

{¶ 60} Next, Smith argues that during closing arguments, the State invoked the

imprimatur of the prosecutor's office in an effort to bolster the credibility of its case. Smith

claims the following statements during closing argument were improper:

[Prosecutor]:   Now, oh gee, well, why didn't you indict them? Why didn't you

indict them? Well let me tell you one thing, and I say this very

definitely, we're - -that authority is put in the Prosecuting Attorney

of Scioto County. You elect him, he does what he thinks is right.

That authority is put in his hands. We make the decisions. We

make the decisions before they get to you. Why wouldn't we - -

gee, why wouldn't we indict all these folks? Why wouldn't we

indict-- well, we did indict them all. Why wouldn't we (inaudible)?

Why did they all plead guilty?

{¶ 61} Smith claims that there are two issues with the State's arguments. First, Smith contends that the prosecutor used the status of his office to elevate the credibility of the witnesses. Second, Smith asserts that the prosecutor introduced the fact that Smith's co-defendants pleaded guilty. Smith argues that "[t]he inference likely drawn from this is that the prosecutor correctly predicted the guilt of the individuals involved in the conspiracy and that they must have correctly presumed [Smith]'s guilt, too."

{¶ 62} In his appellate brief, Smith acknowledges that the State, in the above cited remarks, was responding to the questions of bias among the State's witnesses. In Smith's closing arguments he noted that many of the State's witnesses had charges dropped or reduced in exchange for their testimony. During Smith's cross-examination of many of the State's witnesses, Smith's counsel asked the witnesses about what deals were made in exchange for their testimony.

{¶ 63} We do not find that the State's remarks improperly used the prosecutor's office to elevate the credibility of its witnesses. Instead, the remarks appear to suggest that the State stood by their decisions regarding any deals that it made with their witnesses. Accordingly, we do not find the prosecutor's remarks to be improper.

{¶ 64} Lastly, it is well settled that one person's guilty plea or conviction may not be used as substantive evidence of the guilt of another. *State v. Clark*, 2d Dist. Montgomery No. 13435, 1994 WL 171223, *7 (May 4, 1994), citing *United States v. King*, 505 F.2d 602 (5th Cir.1974). Smith claims that the State improperly mentioned the guilty pleas of the co-defendants during its rebuttal. However, Smith's counsel referenced Smith's 21 co-defendants

during his closing argument before the prosecutor stated the cited arguments. Smith's defense counsel argued that the State's witnesses were less credible because of the deals they made with the State. Therefore, the State's witnesses' plea deals and other agreements in exchange for their testimony were not solely discussed by the State. Smith mentioned those agreements to argue that their testimony was not reliable. Accordingly, we do not find that the State's arguments mentioning the pleas of other co-defendant's materially prejudiced Smith's right to a fair trial.

### 5. The State's conduct did not violate Smith's right to a fair trial.

{¶ 65} Lastly, Smith contends that the cumulative effect of the prosecution's conduct warrants a new trial. We disagree. Here, we have found no instances of prosecutorial misconduct. "And if 'a reviewing court finds no prior instances of error, then the [cumulative-error] doctrine has no application.' " *State v. Jackson*, 4th Dist. Pickaway No. 11CA20, 2012-Ohio-6276, ¶ 52, quoting *State v. McKnight*, 4th Dist. Vinton No. 07CA665, 2008-Ohio-2435, ¶ 108. Although we found that some of the prosecution's remarks were improper, we did not find any of them to constitute a violation of Smith's substantive rights. Even considering them in totality and not just separately, we still do not find that the prosecution's conduct rose to an improper level that requires a new trial. Accordingly, we overrule Smith's first assignment of error.

### B. Assignment of Error II – Smith's Trial Counsel Was Not Ineffective for Failing to Object to the Alleged Instances of Prosecutorial Misconduct.

{¶ 66} In his second assignment of error, Smith argues that he was deprived of the effective assistance of counsel, guaranteed by the Sixth Amendment to the United States Constitution. Smith asserts that his trial counsel was ineffective because he failed to object to the multiple alleged instances of prosecutorial misconduct.

{¶ 67} Criminal defendants have a right to counsel, including a right to the effective assistance from counsel. *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), fn. 14; *State v. Stout,* 4th Dist. Gallia No. 07CA5, 2008-Ohio-1366, ¶ 21. To establish constitutionally ineffective assistance of counsel, a criminal defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E .2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.

{¶ 68} "When considering whether trial counsel's representation amounts to deficient performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Walters,* 4th Dist. Washington Nos. 13CA33, 13CA36, 2014-Ohio-4966, ¶ 23, quoting *Strickland* at 689. "Thus, 'the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *Id.*, quoting *Strickland* at 689. " 'A properly licensed attorney is presumed to execute his duties in an ethical and competent manner.' " *Id.*, quoting *State v. Taylor,* 4th Dist. Washington No. 07CA1, 2008-Ohio-482, ¶ 10. "Therefore, a defendant bears

the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment." *Id.*

{¶ 69} As we have already determined in our analysis of Smith's first assignment of error, none of the alleged instances of prosecutorial misconduct prejudicially affected Smith's right to a fair trial or affected the outcome of the trial. Therefore, Smith cannot demonstrate that but for his trial counsel's failure to object, the outcome of his trial would have been different. Accordingly, we do not find that Smith's trial counsel was ineffective. Smith's second assignment of error is overruled.

### C. Assignment of Error III − Confrontation Clause

{¶ 70} In his third assignment of error, Smith alleges two violations of his Sixth Amendment right to confront the witnesses against him. First, Smith contends that Vass's opinion that he was an active gang member violated his right to confrontation because Vass did not rely on his own knowledge or experience, but instead on another agency's assessment. Second, Smith claims that the trial court violated his right to confrontation by allowing the admission of the criminal predicate statement and the gang book into evidence. Smith argues that the documents, marked as State's Exhibits 4 and 5, contain testimonial hearsay evidence, specifically, numerous police reports prepared by police officers who did not testify at trial.

{¶ 71} In rebuttal, the State argues that the contents of theses documents are admissible as Vass's opinions as an expert witness. The State asserts that the documents explain how Vass arrived at his opinions as well as proving the elements of participating in a criminal gang.

{¶ 72} As an initial matter, we must determine the appropriate standard of review. During Vass's testimony regarding the criminal predicate statement and the gang book, Smith objected to the State's questions. Smith's trial counsel repeatedly argued that the gang activity

reports, dating back to 2011 while Smith was incarcerated, were not relevant to the charges against Smith. However, Smith never objected to Vass's designation as an expert witness or that his testimony violated his Sixth Amendment right to confrontation. Smith's trial counsel also made a broad objection to the admission of the State's exhibits. Smith's objections were noted in the record as follows:

| | |
|---|---|
| [Court]: | Do you have any objections to the exhibits? |
| [Defense Counsel]: | Not other than my - - |
| [Prosecutor]: | What does that mean Bill? |
| [Court]: | Standing objection. |
| [Defense Counsel]: | - -standing objection. I mean, for summative of trial. |
| [Prosecutor]: | Okay. He objects to all of them. |
| [Court]: | All you - - your objection is to the |
| [Defense Counsel]: | I object to - - |
| [Court]: | all the evidence considered in the conspiracy and everything. The Supreme Court says I have to allow it. |
| [Prosecutor]: | And the criminal gang evidence. |
| [Defense Counsel]: | Everything. Every picture that - - that doesn't have my client in it. |
| [Court]: | Okay. All right. Then the exhibits will be admitted. |

Although, Smith's trial counsel objected to the admission of the State's exhibits and to the testimony regarding the criminal gang activity, counsel did not raise a specific objection based on a violation of the Confrontation Clause.

{¶ 73} Evid.R. 103(A)(1) provides that a claim of error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected; and, if the ruling is one admitting the evidence, the opponent of the evidence must raise a timely objection to the evidence, stating the specific ground of objection, unless the ground of objection is apparent from context.

{¶ 74} Here, Smith failed to make a specific objection based on a violation of his Sixth Amendment right to confrontation either during Vass's testimony or during the time the State moved to admit its exhibits. As a result, we may only determine whether admission of those exhibits amounted to plain error. *See State v. Judy*, 4th Dist. Ross No. 08CA3013, 2008-Ohio-5551, ¶ 16; *see also State v. M.B.*, 10th Dist. Franklin No. 08AP-169, 2009-Ohio-752, ¶ 18. "Notice of Crim.R. 52(B) plain error must be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Keeley*, 2012-Ohio-3564 at ¶ 28, citing *Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920 at ¶ 16; *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978) at paragraph three of the syllabus. "To find plain error, we must be able to say that, but for the alleged error, the outcome of trial clearly would have been otherwise." *Id.*, citing *McCausland*, 124 Ohio St.3d 8, 2009-Ohio-5933, 918 N.E.2d 507 at ¶ 15; *Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439 at ¶ 50.

{¶ 75} "The Sixth Amendment's Confrontation Clause provides, 'In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.' " *State v. Maxwell,* 139 Ohio St.3d 12, 9 N.E.3d 930, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34. The Confrontation Clause of the Sixth Amendment is made applicable to the states by the Fourteenth Amendment. *State v. Issa,* 93 Ohio St.3d 49, 752 N.E.2d 904, fn. 4 (2001). Consequently, this constitutional right applies to both federal and state prosecutions, but the right

of confrontation in Article I, Section 10 of the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment. *State v. Arnold,* 126 Ohio St.3d 290, 2010–Ohio–2742, 933 N.E.2d 775, ¶ 12.

{¶ 76} "The United States Supreme Court has interpreted [the Sixth Amendment right to confrontation] to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *Maxwell* at ¶ 34, 9 N.E.3d 930, citing *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* did not define the word "testimonial" but stated generally that the core class of statements implicated by the Confrontation Clause includes statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, quoting the amicus brief of the National Association of Criminal Defense Lawyers.

**1. Vass's testimony classifying Smith as an active gang member did not result in plain error.**

{¶ 77} First, we will address Smith's claim that Vass's testimony violated his Sixth Amendment right to confrontation. Smith argues that Vass's testimony that he was still an active gang member was not based on Vass's experience and knowledge. Instead, Smith asserts that Vass was only relaying what other investigating officers or the DOC had concluded. Smith claims that Vass's testimony insulated the actual witness from cross-examination, such as those who prepared the DOC report or Detective Sarah Cross of CPD, who compiled the gang book.

{¶ 78} During its direct examination of Vass, the State presented the following relevant

testimony:

[Prosecutor]:  * * *Where I'm going with that is, did you consider him to be an

active member of the 22nd Street Bloods before he went to prison

this last time?

[Vass]:        Yes, ma'am.

[Prosecutor]:  Did you consider him to be an active member of the

22nd Street Bloods while incarcerated?

[Vass]:        Yes, ma'am.

[Prosecutor]:  Okay. And do you consider him to be active now?

[Vass]:        Yes, ma'am.

[Prosecutor]:  Okay. You've had an opportunity to review the evidence in this

case and you've got copies of all of that for your gang

documentation; is that right?

[Vass]:        Yes, ma'am.

[Prosecutor]:  And using that you still declare him as an active member?

[Vass]:        We do.

{¶ 79} On cross-examination, Smith's trial counsel questioned Vass about the basis of his

opinion. Smith's trial counsel also followed up by stating that the gang book on Smith did not

contain any gang activity during Smith's incarceration from 2010 to 2014. Vass testified that

according to a report obtained from the OLEG database, the DOC considered Smith to be an

active gang member as of November 2013, when Smith was released from prison. Vass also

testified that regardless of the CPD's two-year active/inactive guideline, if the DOC lists

someone as active, then that person will maintain an active status with CPD. Further relevant
testimony during Smith's cross-examination of Vass was as follows:

[Defense Counsel]:     So he can - -can - -be considered as an active status,

                       although there's a five year gap where there's no gang

                       activity.

[Vass]:                That five years was when he was in prison. I - - I can't

                       testify what happened while he was in prison is what I'm

                       saying.

[Defense Counsel]:     Okay. But the - - but the OLEG

                       information should say what activity right?

[Vass]:                Yeah. The OLEG will say he's in a status - - an

                       active status. The Ohio Department of Corrections would

                       have to furnish the documentation to support that.

[Defense Counsel:      If he was an active gang member in prison- -

[Vass]:                Um hmm.

[Defense Counsel]:     - -would there be documentation of it?

[Vass]:                The Ohio Department of Corrections would have that

                       documentation.

{¶ 80} The admission of Vass's testimony would be error if he communicated out-of-
court testimonial statements directly to the jury in the guise of an expert witness. *See United
States v. Lombardozzi*, 491 F.3d 61, 78 (2d Cir.2007). Evid.R. 703 states, "[t]he facts or data in
the particular case upon which an expert bases an opinion or inference may be those perceived
by the expert or admitted in evidence at the hearing." Here, it is without question that Vass relied

on the DOC report to form his opinion that Smith was presently an active gang member. The DOC report, which was obtained thorough OLEG was admitted into evidence as part of the gang book. Beyond Smith's general objection to all the State's exhibits, Smith never made a specific objection to the report's admission based on hearsay, a violation of the Sixth Amendment, or Vass's designation as an expert witness.

{¶ 81} The DOC report itself does not appear to be testimonial in nature, to wit: it is not prepared for the primary purpose of accusing an individual or for providing evidence in a criminal trial. *See State v. Everson*, 7th Dist. Mahoning No. 12MA128, --- N.E.3d ----, 2016-Ohio-87 at ¶ 46. If the DOC report was not testimonial, there would be no violation of Smith's Sixth Amendment right to confront the witnesses against him. Further, where an expert witness's testimony constitutes his/her own original observations and opinions, there is no violation of the Confrontation Clause, because the expert is available for cross-examination regarding them. *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930 at ¶ 53. Ultimately, even if Vass's opinion based on the DOC report violated Smith's Sixth Amendment right to confrontation, we are still required to find plain error.

{¶ 82} Reviewing Smith's argument for plain error, we do not find that but for Vass's testimony the outcome of the trial would be different. Smith's main contention here on appeal is that Vass was able to opine that he was an active member solely based on a DOC report and not any CPD investigations. However, the jury was made aware of Smith's issues with Vass's testimony through extensive cross-examination. Vass admitted that he considered Smith an active member even in the absence of any gang activity during Smith's incarceration. Vass also admitted that the DOC would have to furnish the information justifying his classification of Smith as an active participant in the 22nd Street Bloods. Therefore, Smith's trial counsel

effectively cross-examined Vass on his opinion that Smith was an active gang member.

Accordingly, we do not find that Vass's testimony that Smith was an active gang member

resulted in plain error.

**2. Admission of the gang book and the criminal predicate statement did not result in plain**

**error.**

{¶ 83} Smith also asserts that the admission of the criminal predicate statement, State's

Exhibit 4, and the gang book, State's Exhibit 5, violated his Sixth Amendment right to confront

the witnesses against him. Smith contends that the gang book and the criminal predicate

statement contain testimonial statements made by police officers and compiled in those

documents for the purpose of a future prosecution. Thus, because those officers did not testify at

trial, Smith argues his Sixth Amendment right to confront the witnesses against him was

violated.

{¶ 84} The State argues that the gang book on Smith and the criminal predicate statement

on the 22nd Street Bloods are not "statement[s] contemplated by *Crawford*." The State contends

that the "contents of the documents are admissible under these circumstances as the opinions of

an expert and how he arrived at those opinions as well as proving the elements of participation in

a criminal gang."

{¶ 85} The criminal predicate statement contains information purported to show that the

22nd Street Bloods are a criminal gang within the definition set forth in the Ohio Revised Code.

The exhibit is a binder that contains pictures of gang signs, tattoos that reference the gang,

graffiti, pictures of various members, and clothing indicating affiliation with the 22nd Street

Bloods. However, the exhibit most prominently contains approximately 45 pages of summaries

of criminal activity involving the 22nd Street Bloods dating back to 1996. The summaries often

include the name(s) of the police officer(s) who filed a report, the police officer's investigative

findings, and the names of one or more documented members of the 22nd Street Bloods. Smith is

named in some of these summaries. For example, the following statement is contained within the

criminal predicate statement:

> **January 5, 2007** a CS contacted Detective Brooks with information on the
>
> ongoing activities of documented Deuce Deuce Blood member **William "Dollar**
>
> **Bill" Morrison**. The CS stated that **William Morrison** and **Jerrell "Rebel**
>
> **Harrison** [sic] had been seen in a house at 556 Stanley Avenue selling crack. At
>
> approximately 11:45PM Detective Brooks #2080, S/A Merimee of the DEA and
>
> several other CDP Patrol officers went to the area of 556 Stanley Avenue to find
>
> the Deuce Deuce Bloods.* * * Once inside the officers found Miller, as well as
>
> documented members **Jerrell "Rebel" Harrison**, **William "Dollar Bill"**
>
> **Morrison**, **Thomas Smith** [defendant-appellant] and **Roy "T-Roy" Kendricks**.
>
> Also found in the house was 16 baggies of marijuana, four red bandanas, three
>
> photos of Blood gang members, 31 rounds of ammunition, 1 hand gun clip, and
>
> on **Smith's** cell phone a picture of Smith holding an assault riffle and covering his
>
> face with a red bandana.* * *

{¶ 86} The gang book on Smith, like the criminal predicate statement, also contains

summaries of police investigations into Smith's criminal activity. The gang book includes

pictures of Smith, some of his clothing, and his tattoos. The gang book contains 11 pages of

summaries of investigative reports dating back to 2001. In addition to the summaries of police

investigation, the gang book also contains full form "investigative reports" and "field interviews"

involving Smith. To illustrate, the following statement is included in the gang book on Smith:

**September 19, 2006**- Detective P. Brooks #2080 and Officer S. Wier #1486

conducted surveillance on South 22nd Street an area known for Deuce Deuce

Blood gang activity. Documented Deuce Deuce member **Chasjuan Meeks** was

observed engaging in behavior that indicated he was conducting narcotics sales.

Meeks was joined by documented Deuce Deuce member **Courtney Anderson**,

and shortly after this **<u>Thomas Smith</u>** arrived in **Anderson's** car. **Smith** took two

bags from the car and walked off south on South 22nd Street. (SRB06-221)

{¶ 87} Both the criminal predicate statement and the gang book on Smith contain

numerous summaries of police reports like the ones cited above. During trial, the State asked

Vass to read some of the entries. Vass read entries from the criminal predicate statement

concerning the gang's criminal activities expanding into Charleston, West Virginia and

Portsmouth, Ohio. Vass also read an entry, dated October 27, 2006, stating that a Bureau of

Criminal Investigations Officer and a Drug Enforcement Agency Special Agent debriefed a

criminal informant about narcotics activities involving the 22nd Street Bloods, specifically that

gang member Andre Gilliam was selling crack in Portsmouth, Ohio.

{¶ 88} Vass also read excerpts from the gang book on Smith dated May 10, 2007, March

20, 2008, December 26, 2008, and February 2, 2009. In its appellate brief, the State explains that

the criminal predicate statement and the gang book contain "a history of contacts with the police

since the Gang Unit was organized. The contacts include "* * *personal contacts, court contacts,

surveillance reports and reports filed by non-Gang Unit officers." In its appellate brief, the State

argues that "[t]he contents of the documents are admissible under these circumstances as the

opinions of an expert and how he arrived at those opinions as well as proving the elements of

participation in a criminal gang."

{¶ 89} In general, the core class of statements implicated by the Confrontation Clause includes statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (Other quotations omitted.) *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930 at ¶ 35, citing *Crawford*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. Statements are testimonial "* * *when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266. Since the *Crawford* decision, the United States Supreme Court has resolved a number of cases concerning the Confrontation Clause. *See Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011); *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011); *Melendez-Diaz*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314; *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008); *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *Williams v. Illinois*, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).

{¶ 90} In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321, 129 S.Ct. 2527, 174 L.Ed.2d, 314 (2009) the United States Supreme Court addressed whether "certificates of state laboratory analysts stating that material seized by police and connected to petitioner was cocaine of a certain quantity" violated the petitioner's Sixth Amendment right to confront the witnesses against him. *Id.* at paragraph one of the syllabus. In ruling that the admission of those certificates without the testimony of their authors violated the Confrontation Clause, the Court stated:

> Here, moreover, not only were the affidavits " 'made under circumstances which
> would lead an objective witness reasonably to believe that the statement would be

available for use at a later trial,' " *Crawford*, *supra*, at 52, 124 S.Ct. 1354, but

under Massachusetts law the sole purpose of the affidavits was to provide "prima

facie evidence of the composition, quality, and the net weight" of the analyzed

substance, Mass. Gen. Laws, ch. 111, § 13. We can safely assume that the

analysts were aware of the affidavits' *evidentiary purpose*, since that purpose—as

stated in the relevant state-law provision—was reprinted on the affidavits

themselves.

*Id.* at 311 (Emphasis Added).

{¶ 91} In *Bullcoming*, the United States Supreme Court held "that another scientific

report could not be used as substantive evidence against the defendant unless the analyst who

prepared and certified the report was subject to confrontation." *Williams* at 2233. The Court

stated: "A document created solely for an 'evidentiary purpose,' *Melendez–Diaz* clarified, made

in aid of a police investigation, ranks as testimonial." *Bullcoming* at 664.

{¶ 92} In *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, the appellant

challenged the admission of an autopsy report citing the *Melendez-Diaz* decision. In

distinguishing the facts in *Maxwell* from *Melendez-Diaz* and *Bullcoming*, the Ohio Supreme

Court stated the following:

The dissent [in *Maxwell*] rejects the primary-purpose test and would hold that

whether a particular autopsy report is testimonial should be determined on a case-

by-case basis. But generally, autopsy reports are neither (1) prepared for the

primary purpose of accusing a targeted individual nor (2) prepared for the primary

purpose of providing evidence in a criminal trial. For Sixth Amendment purposes,

it is only the *primary* purpose of a document that determines whether it is

testimonial or not.

In both cases, the forensic reports were made at the request of police, for specific

"evidentiary purposes" in order to aid in a police investigation. The record does

not show that to be the case here. We hold that an autopsy report that is neither

prepared for the primary purpose of accusing a targeted individual nor prepared

for the primary purpose of providing evidence in a criminal trial is

nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a

business record does not violate a defendant's Sixth Amendment confrontation

rights.

*Id*. at ¶¶ 62-63.

{¶ 93} In *State v. Hall*, 8th Dist. Cuyahoga No. 96680, 2012-Ohio-266, the Eighth

District Court of Appeals found that the admission of police reports violated the Confrontation

Clause. Specifically, the court stated:

Here, two police reports were admitted into evidence over defense counsel's

objection. Both reports contain testimonial statements "that would lead an

objective witness to believe the statement would be available for use at a later

trial." *Crawford* at 51-52. The reports contain statements of investigating officers

who were not responding to an emergency and who did not testify at trial.

According to one report, Officers Daniel Baillis, Bryan Curry, and Gerald

Bronson investigated the crime in addition to Artara Adams. The second report

identifies additional officers Mark Bickerstaff, Johnny Harris, and Michelle Wolf

as investigating officers. One report identifies Officer Daniel Baillis as the

reporting officer, while the second report identifies Officer Johnny Harris as the reporting officer. Yet none of these officers testified at trial except Det. Adams. The police reports further indicate that the police were investigating Hall for crimes of menacing and intimidation of a crime victim or witness. Such statements are unfairly prejudicial since he was not on trial for theses offenses.

*Id.* at ¶ 22.

{¶ 94} Here, it is without question that both the criminal predicate statement on the 22nd Street Bloods and the gang book on Smith contain investigative reports composed by officers who did not testify at Smith's trial. Based on Vass's testimony and the fact that her name appears at the bottom of nearly every page, Detective Sarah Cross was responsible for compiling the two exhibits. While the criminal predicate statement contains just summaries of other officers' investigative reports, the gang book includes both the summaries and the actual reports themselves. Neither Cross nor the other police officers, whose reports were included in the exhibits, testified at trial.

{¶ 95} In order for the admission of these exhibits to result in a violation of Smith's Sixth Amendment right to confrontation, the content must be testimonial. Without parsing out each and every statement included in the criminal predicate statement and gang book, we find that the criminal predicate statement and the gang book both contain testimonial statements. Whether it is the summaries of police investigations or the actual investigative reports themselves, we find the statements contained within to be testimonial.

{¶ 96} We base our conclusion on the following reasons. First, at least some of the police investigations either included or summarized in the gang book had a primary purpose of establishing or proving past events potentially relevant to later prosecution. *See Davis*, 547 U.S.

at 822, 126 S.Ct. 2266; *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930 at ¶ 63;

*Hall* at ¶ 22. Some of the investigative reports included in the gang book identify the "Criminal

Activity" as "Participating in a Criminal Gang." The first page of the gang book states that the

criminal activity associated with Smith includes: "Engaging in Corrupt Activity, Drug

Trafficking (MDO), Possession of Drugs and Participating in a Criminal Gang." Those are the

offenses for which Smith was indicted here in this case. Further, Vass testified that the gang

book is the CPD's actual case file on Smith and was prepared "for court when an individual is

going to trial." Even in its appellate brief the State argues that the criminal predicate statement

and the gang book "* * * are admissible as the opinions of an expert and how he arrived at those

opinions as well as *proving the elements of participation in a criminal gang.*" (Emphasis Added.)

Accordingly, we find that, the criminal predicate statement, State's Exhibit 4, and the gang book,

State's Exhibit 5, contain testimonial statements from individuals who did not testify at trial.

{¶ 97} The State cites multiple cases in its appellate brief following its argument that the

contents of the criminal predicate statement and the gang book are admissible. *See State v. King*,

8th Dist. Cuyahoga No. 98234, 2013-Ohio-574; *State v. McCraney*, 9th Dist. Summit Nos.

24750 & 2528, 2010-Ohio-6128; *State v. Stewart*, 3d Dist. Seneca No. 13-08-18, 2009-Ohio-

3411; *State v. Gaiter*, 9th Dist. Summit No. 24758, 2010-Ohio-2205, ¶ 61. However, only one of

those decisions, *Stewart*, addresses a Confrontation Clause issue. In *Stewart*, appellant argued

that the trial court violated the Confrontation Clause when it admitted video and audio recordings

of persons who did not testify at trial. *Id*. at ¶ 78. What is common in all of those decisions is that

they involve a defendant who was charged with participating in a criminal gang. Also, in those

cases, the State offered testimony from police officers, often designated as expert witnesses,

regarding gang activity.

{¶ 98} However, the issue raised by Smith here does not concern the State's strategy in providing gang expert testimony. Ohio courts have found expert testimony on gang related activities can be relevant to the issues presented in a case. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 112; *State v. Peterson*, 10th Dist. Franklin No. 07AP-303, 2008-Ohio-2838 ¶¶ 37-38. "Gang evidence also may be relevant when it is necessary to 'provide[ ] the jury with crucial background information in considering the evidence.' " *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, 963 N.E.2d 162 (10th Dist.).

{¶ 99} The main issue is the fact that vast amounts of police reports were admitted into evidence through the contents of the criminal predicate statement and the gang book. The cases cited by the State do not support an argument that the exhibits were permissible under the Confrontation Clause. We further note that Evid.R. 803(8)(b) provides that in criminal cases, police matters observed by police officers and other law enforcement personnel are inadmissible. *Hall*, 2012-Ohio-266 at ¶ 12.

{¶ 100} Accordingly, for the above stated reasons, we find that the admission of the testimonial police reports contained in the criminal predicate statement and the gang book violated Smith's Sixth Amendment right to confront the witnesses against him.

{¶ 101} Nevertheless, because we are conducting a plain error review, we must next determine whether the admission of the testimonial statements clearly affected the outcome of the trial.

{¶ 102} Most of the criminal investigative material documented in the criminal predicate statement and the gang book occurred before the alleged time period that Smith committed the indicted offenses. The indictment alleged that Smith's criminal conduct occurred between January 1, 2011 and July 13, 2014. Smith was released from incarceration in November 2013.

From the time after his release, the gang book only contained reports from May 18, 2014, when Smith was stopped by a police officer and cited with failure to reinstate his operator's license and from June 9, 2014, when Portsmouth Police stopped Smith and the other co-defendants in connection with the charges here. Therefore, the gang book did not contain significant information implicating Smith in the indicted offenses. Further, Smith admitted during his testimony that he was an active gang member before he was incarcerated in 2009.

{¶ 103} The most damaging evidence against Smith came from testimony of the seven witnesses that observed Smith's involvement with the drug trafficking operation. Together with Justice's testimony, evidence was established that Smith was involved with the operation involving the 5574 phone number and other identified 22nd Street Bloods members. It is true that Smith denied most of the damaging testimony. In the absence of the documentation contained in the criminal predicate statement and the gang book, the jury would have been left with the testimony of the investigating officers and the seven witnesses that testified regarding Smith's involvement with the drug trafficking operation. The weight to be afforded evidence and the credibility of testimony are issues to be determined by the trier of fact. *State v. Frazier*, 73 Ohio St.3d 323, 339, 652 N.E.2d 1000 (1995), citing *Grant*, 67 Ohio St.3d at 477, 620 N.E.2d 50. Therefore we are reluctant to reverse the jury's determination of guilt under those circumstances.

{¶ 104} For those reasons, we do not find that the outcome of the trial clearly would have been different absent of the testimonial statements present in the criminal predicate statement on the 22nd Street Bloods and the gang book on Smith. Smith's third assignment of error is overruled.

**D. Assignment of Error IV − Smith Was Not Denied His Right to a Fair Trial Through the**

**Cumulative Error Doctrine.**

{¶ 105} In his fourth assignment of error, Smith argues that his convictions should be reversed on the basis of cumulative error. Smith contends that the scope of this case carried a risk of confusion with the issues and the evidence introduced at trial. Smith asserts that the State's strongest evidence against him came from witnesses who had received something in exchange for their testimony. Smith argues that the jury's decision about who to believe was affected by the admission of his past criminal conduct documented in the gang book and the criminal predicate statement. Thus, Smith concludes that he was denied his right to a fair trial and due process of law.

{¶ 106} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of [the] numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Harrington*, 4th Dist. No. 05CA3038, 2006-Ohio-4388, ¶ 57, citing Goff, 82 Ohio St.3d at 140, 694 N.E.2d 916.

{¶ 107} In our analysis of Smith's first three assignments of error, we found only one error, the admission of the testimonial statements in the criminal predicate statement and the gang book. While we did find that a portion of the prosecutor's conduct was improper, it did not rise to the level of prosecutorial misconduct that violated Smith's right to a fair trial. Considering our prior analysis, and the entirety of the proceedings below, we do not find that Smith's

convictions should be reversed because of cumulative error. Smith's fourth assignment of error is overruled.

### E. Assignment of Error V − The Trial Court Should Have Merged Two of Smith's Convictions as Allied Offenses of Similar Import.

{¶ 108} In his fifth assignment of error, Smith argues that the trial court erred when it did not merge his conviction for engaging in a pattern of corrupt activity with his conviction for participating in a criminal gang. With regards to the similar import nature of those convictions, Smith argues that the harm resulting from each offense was the same, to wit: drug trafficking. Smith contends that the harm is not distinct or separate. Further, Smith argues that the conduct making up both convictions was the same. Finally, Smith contends that the convictions resulted from the same motivations. Accordingly, Smith concludes that the trial court should have merged the offenses, as they are allied offenses of similar import.

{¶ 109} Initially, we note that Smith failed to argue that his two convictions should merge. Smith's trial counsel did state a general objection to the trial court's sentence at the sentencing hearing; but at no time did counsel assert that the convictions were allied offenses. Therefore, Smith has waived all but plain error. Recently, the Ohio Supreme Court clarified that the failure to raise the issue of merging allied offenses of similar import in the trial court results in forfeiture of the issue, as opposed to waiver of the issue. *State v. Rogers*, 143 Ohio St.3d 385, 393, 2015-Ohio-2459, 38 N.E.3d 860, 867, ¶ 21. Accordingly, we will review Smith's argument for plain error. In the past, this Court recognized, that the trial court plainly errs when it imposes multiple sentences for allied offenses of similar import. *State v. Wilson*, 4th Dist. Scioto No. 13CA3542, 2015-Ohio-2016, ¶ 63.

{¶ 110} "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. " '[T]he appellate court must * * * independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id*. at ¶ 26, quoting *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The reviewing court owes no deference to the trial court's application of the law to the particular facts of the case being reviewed. *Id*.

{¶ 111} R.C. 2941.25, Ohio's multiple counts statute, provides:

(A) Where the same conduct by defendant can be construed to constitute two or

more allied offenses of similar import, the indictment or information may contain

counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar

import, or where his conduct results in two or more offenses of the same or

similar kind committed separately or with a separate animus as to each, the

indictment or information may contain counts for all such offenses, and the

defendant may be convicted of all of them.

{¶ 112} The statute codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, and Section 10, Article I of the Ohio Constitution, which prohibits the imposition of multiple punishments for the same offense. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. In other words, upon finding one or more counts to constitute two or more allied offenses of similar import, R.C. 2941.25(A) requires that the convictions be merged for the purposes of sentencing and that the

defendant only be sentenced on one of the counts. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 5.

{¶ 113} The Ohio Supreme Court has interpreted R.C. 2941.25 to involve a two-step analysis for determining whether offenses are subject to merger. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. Under step one, it must be determined whether "it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other." (Emphasis sic.) *Id.* at ¶ 48. Put another way, if the conduct of the defendant constituting commission of offense one also constitutes commission of offense two, then the offenses are of similar import and the court must proceed to the second step. *Id.* Under step two of the analysis, it must be determined whether the offenses were committed as part of a single act, with a single state of mind. *Id.* at ¶ 49. If both steps of the analysis are met, then the offenses are allied offenses of similar import and will be merged. *Id.* at ¶ 50. On the other hand, if commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or with a separate animus for each offense, then under R.C. 2941.25(B), the offenses will not merge. *Id.* at ¶ 51.

{¶ 114} Recently, in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court provided courts with further guidance with respect to the R.C. 2941.25 merger determination. Although the Supreme Court did not explicitly overrule *Johnson,* it stated that the "decision in *Johnson* was incomplete" and that *Johnson's* syllabus language "does not offer the complete analysis necessary to determine whether offenses are subject to merger rather than multiple convictions and cumulative punishment." *Id.* at ¶ 16.

{¶ 115} The Ohio Supreme Court in *Ruff* lists three questions for a reviewing court to ask when a defendant's conduct supports multiple offenses in order to determine whether those

offenses are allied offenses of similar import within the meaning of R.C. 2941.25: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? If one of the questions is answered affirmatively, then separate convictions are permitted. The conduct, the animus, and the import must all be considered.

{¶ 116} With respect to the first question, as explained in *Ruff,* offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus. When applying the *Ruff* test, we look at the conduct of the defendant in the context of the statutory elements. *See State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 82. The relevant statute for engaging in a pattern of corrupt activity, R.C. 2923.32(A)(1) states: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." Likewise, the relevant participating in a criminal gang statute, R.C. 2923.42 provides that:

> No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

{¶ 117} Here, the State argues that the offenses were committed separately over a long period of time and were committed against multiple victims. The State further asserts that "[t]he

victims of theses offenses and those in the predicate offenses are different. These are separate human beings and regardless of their addiction or their ways of generating income, they are entitled to the protection of the law, the same protection [Smith] claims for himself." However, as this Court has previously stated, " * * *we are examining whether there are separate or different victims of [the offenses in question]." *State v. Gillman*, 2015-Ohio-4421, 46 N.E.3d 130 ¶ 22 (4th Dist.) (rejecting the State's argument that offense should not merge because "there was [sic] multiple victims in these instances.").

{¶ 118} Here, we cannot discern separate victims for Smith's conduct in engaging in a pattern of corrupt activity and participating in a criminal gang. Looking at the indictment, the alleged time period when the offenses were committed are the same, to wit: from January 1, 2011 to July 13, 2014. Furthermore the State relied on the exact same predicate events to support both the charge of engaging in a pattern of corrupt activity and participating in a criminal gang. Likewise, we also cannot discern that the harm resulting from each offense is separate and identifiable. The Ohio Supreme Court has held that "[o]ffenses under R.C. 2923.32 are *mala prohibita*, *i.e.,* the acts are made unlawful for the good of the public welfare regardless of the state of mind." *State v. Schlosser,* 79 Ohio St.3d 329, 333, 681 N.E.2d 911 (1997). Further, "[w]hether a defendant knowingly, recklessly or otherwise engages in a pattern of corrupt activity, the effect of his activities on the local and national economy is the same." *Id.*, quoting *State v. Haddix*, 93 Ohio App.3d 470, 638 N.E.2d 1096 (1994). It is reasonable to conclude that the harm that stems from the offense of participating in a criminal gang is similar to the harm produced by the offense of engaging in a pattern of corrupt activity. There is no evidence in the record that demonstrates that one charge produced separate harm from the other. Accordingly,

the answer to whether Smith's conduct constituted offenses involving separate victims or separate harm is "no." We must proceed with our inquiry.

{¶ 119} We will continue our analysis with the second question presented by *Ruff*: "Were [the offenses] committed separately?" *Ruff* at ¶ 31. As we have already stated, the indictment alleges that the charge of engaging in a pattern of corrupt activity and the charge of participating in a gang took place during the same time period, from January 1, 2011 to July 13, 2014. After a review of the record, we cannot discern any evidence of Smith's conduct demonstrating that the offenses were committed separately. Smith's incriminating conduct was his active role in a drug operation. Examining the statutes again, the "pattern of corrupt activity" stated in R.C. 2923.32(A)(1) is defined as: "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). The "pattern of criminal activity" as stated in R.C. 2923.42(A) is defined as:

> subject to division (B)(2) of this section, that persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:
>
> (a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;
>
> (b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;

(c) A violation of section 2907.04, 2909.06, 2911.211, 2917.04, 2919.23, or

2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code,

section 2925.03 of the Revised Code if the offense is trafficking in marihuana, or

section 2927.12 of the Revised Code.

R.C. 2923.41(B)(1).

{¶ 120} The evidence of the drug operation, specifically the predicate offenses combined

with the direct or indirect involvement in the overall illegal entity served to show that Smith was

both engaging in a pattern of corrupt activity and a pattern of criminal activity. Again, the

evidence in the record does not demonstrate that Smith's conduct served to commit one of the

offenses separate from the other. Accordingly, the answer to whether Smith's committed the

offenses separately is "no." We must proceed with our inquiry.

{¶ 121} The final question presented by *Ruff* is "Were they committed with separate

animus or motivation?" Smith argues that there is no evidence to support the existence of

different motivations for the two offenses. Vass did testify that, in general, gangs use the profits

from illegal activity to buy the latest clothing, shoes, cell phones and other material possessions.

We are unable to distinguish another motivation behind Smith's conduct. Therefore, Smith's

motivation for committing the offense of engaging in a pattern of corrupt activity and

participating in a criminal gang is the same. Accordingly, the answer to whether Smith's

convictions were committed with a separate animus or motivation is "no."

{¶ 122} Because we answered "no" to all the questions presented by *Ruff*, we find that

the trial court should have merged Smith's convictions for engaging in a pattern of corrupt

activity and participating in a criminal gang as allied offenses of similar import. Accordingly, we

sustain Smith's fifth assignment of error. We remand this cause to the trial court for proceedings consistent with this decision.

### IV. Conclusion

{¶ 123} We have overruled Smith's first, second, third, and fourth assignments of error. As a result, Smith's convictions are affirmed. However, we sustain Smith's fifth assignment of error because we find that his convictions for engaging in a pattern of corrupt activity and participating in a criminal gang should merge as allied offenses of similar import. This cause is remanded to the trial court for the limited purpose of conducting a new sentencing hearing consistent with this opinion.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CAUSE REMANDED.

Harsha, J., concurring in part and dissenting in part:

{¶ 124} I concur with most of the court's judgment and opinion. However, there are several areas where I differ in my conclusions.

{¶ 125} First, I conclude the State improperly vouched for witness Schuman's credibility when it referenced a prior opinion by a trial judge about her reliability. However, because that reference was not outcome determinative, it did not amount to plain error.

{¶ 126} On the other hand, I find nothing improper about the State's "sack of bologna" comment during cross-examination of the appellant.

{¶ 127} Finally, I would exercise the discretion afforded us by Crim.R. 52(B) and decline to apply plain error on the merger issue. *See State v. Barnes*, 98 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *see also*, *State v. Askew*, 4th Dist. Ross No. 05CA2877, 2006-Ohio-4769, ¶ 23.

{¶ 128} In all other regards, I concur in judgment and opinion.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED IN PART, REVERSED IN PART and that the CAUSE BE REMANDED for further proceedings consistent with this opinion. Appellant and appellee shall split the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.: Concurs in Judgment and Opinion.
Harsha, J.: Concurs in Part and Dissents in Part with Opinion.

                              For the Court


                              BY: _____
                                    Marie Hoover, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**