[Cite as *State v. Anders*, 2018-Ohio-1375.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 17CA3595 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| JASON A. ANDERS, | : | **RELEASED: 04/04/2018** |
| Defendant-Appellant. | : | |

<u>APPEARANCES</u>:

Timothy Young, Ohio Public Defender, and Nikki Trautman Baszynski, Ohio Assistant Public Defender, Columbus, Ohio, for appellant.

Matthew S. Schmidt, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.

Harsha, J.

**{¶1}** After a jury convicted Jason A. Anders of three counts of rape, the court sentenced him to an aggregate prison term of 30 years to life. Claiming that his constitutional right to a speedy trial was violated when the state waited nearly two years and nine months after the indictment to arrest him, Anders asserts the trial court incorrectly denied his motion to dismiss the charges. Although this delay was presumptively prejudicial and triggered a speedy trial analysis, our review of the factors in *Barker v. Wingo*, 407 US 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), supports the trial court's decision. The delay was not so protracted or egregious that it warranted granting relief absent a showing of some particularized trial prejudice, which Anders has not done.

**{¶2}** Next Anders contends that his convictions for rape were against the manifest weight of the evidence because the victim's testimony was inconsistent,

unreliable, and incredible. We have reviewed the entire record, weighed the evidence, applied all reasonable inferences, and considered the credibility of witnesses. As a result we conclude that the jury did not clearly lose its way in resolving conflicts in the evidence and create such a manifest miscarriage of justice that we must reverse the rape convictions. The jury was free to credit the child victim's testimony, which established beyond a reasonable doubt that Anders committed the three rapes.

{¶3} Therefore, we overrule Anders's assignments of error and affirm his convictions and sentence.

## I. FACTS

{¶4} In February 2014, the Ross County Grand Jury returned a secret indictment charging Jason A. Anders with three counts of rape in violation of R.C. 2907.02(A)(1)(b), with the specification that the victim, J.D., was less than ten years old. The indictment alleged that the rapes occurred in the period from August 2007 through June 2008. The court issued a warrant on the indictment with special instructions to enter it into the LEADS[1] database as a radius pick-up of 1[2] and to direct it to Detective Tony Wheaton of the Ross County Sheriff's Office for service.

{¶5} Nearly 33 months later in November 2016, the U.S. Marshal's Office arrested Anders on the warrant. Less than a month following the service of the warrant, Anders filed a motion to dismiss the indictment based on a purported violation of his constitutional right to a speedy trial. He claimed that the post-indictment delay of 33 months between the issuance of the indictment and his arrest violated the Sixth

---

[1] LEADS stands for the Law Enforcement Automated Data System. *See State v. Chancey*, 4th Dist. Washington No. 15CA17, 2015-Ohio-5585, ¶ 16.

[2] Radius 1 refers to a warrant active anywhere in the United States.

Amendment. He argued: (1) the delay was presumptively prejudicial; (2) the delay was caused solely by the state's negligence as it made no efforts to serve him with the warrant; (3) he timely asserted his right to dismissal of the charges; and (4) his defense was impaired by the delay because neither he nor his family have any recollection of ever living at the Bainbridge, Ohio address where the offenses were alleged to have occurred.

## A. Motion to Dismiss

### 1. The State's Evidence

{¶6} Detective Wheaton testified at the hearing on the motion to dismiss. Wheaton indicated he took several initial steps to attempt to contact Anders in October 2012, prior to the indictment. He ran a background check that listed Anders's address as 27 West Main St., Mt. Sterling, Ohio. Because that address was in Madison County, he asked the Madison County Sheriff's Office to contact Anders and request that he contact the Ross County Sheriff's Office. In December 2012 and February 2013, Det. Wheaton personally travelled to the Mt. Sterling address in unsuccessful attempts to locate Anders. In July 2013, he again travelled to the Mt. Sterling address, where a new tenant advised him that Anders had moved out the previous summer; however, Anders's mail was still coming there. Det. Wheaton checked with the local post office and determined that Anders had not left a forwarding address.

{¶7} Det. Wheaton then attempted to contact Anders's parents at the Washington Courthouse address supplied by the victim's father, Shane. Det. Wheaton twice requested the Washington Courthouse Police Department to contact Anders's

parents. Moreover, he personally travelled to the parents' residence and left notes for them to contact him; he never received any response.

{¶8} After issuance of the secret indictment in February 2014, Det. Wheaton again made multiple attempts to locate Anders. In March 2014, Det. Wheaton ran a check on OLEG,[3] but it listed the Mt. Sterling address Wheaton had used unsuccessfully. Wheaton also maintained contact with Shane, who had informed Wheaton that he was still communicating with some of Anders's old friends and family members in an effort to find him. Again in September 2014 and July 2015, Det. Wheaton contacted Shane, who had no new information on Anders's whereabouts.

{¶9} In January 2015, Det. Wheaton ran Anders's social security number through LEADS, but it still showed the old Mt. Sterling address. He also checked Facebook but was unable to find Anders there.

{¶10} In August 2015, Shane telephoned Det. Wheaton to say he was unsure where Anders was living "but he had heard that he may be living somewhere in Kentucky." In August 2015 and January 2016, Det. Wheaton requested a LEADS check of Anders in both Ohio and Kentucky. The Ohio check came back with the Mt. Sterling address. The Kentucky LEADS search was not fruitful because Det. Wheaton was not LEADS certified and Anders's Kentucky driver's license was necessary to obtain an accurate check. Because Det. Wheaton did not know whether Anders had a Kentucky driver's license, the dispatch center could not obtain information outside of the Ohio system other than there were no warrants or convictions for Anders in Kentucky. Det. Wheaton also checked for any Facebook accounts for Anders again but he was

---

[3] OLEG is the Ohio Law Enforcement Gateway. *See State v. Smith*, 2016-Ohio-5062, 70 N.E.3d 150, ¶ 11 (4th Dist.).

unsuccessful. Again Wheaton talked to Shane, who could not provide any information other than he was still hearing that Anders was living somewhere in Kentucky.

{¶11} In September 2016, the U.S. Marshal's Office contacted the Ross County Sheriff's Office and asked if it needed assistance in locating any individuals with outstanding warrants. The sheriff's office gave the warrant for Anders to the U.S. Marshal's Office for service. In October or November 2016, the U.S. Marshal's Office located Anders in Kentucky and arrested him.

{¶12} On cross-examination Det. Wheaton acknowledged that he had not tried to contact the IRS or the Kentucky Bureau of Motor Vehicles to locate Anders. However, he continued unsuccessfully to search additional social media outlets like Twitter. And he had contacted Anders's former Ohio employer, who provided the same Mt. Sterling address.

2. The Defense Testimony

{¶13} Anders testified that from the dates of the alleged rapes in 2007-2008 until his arrest, he lived in three different places in Ohio—the Moxley Road, Bainbridge house where the crimes allegedly occurred, an apartment in Mt. Sterling, and his wife's brother's residence in Washington Courthouse—as well as three different places in Kentucky. He got married before he moved to Kentucky, worked at two different jobs there, and made no effort to conceal where he was living. Anders had no idea he had an outstanding warrant for his arrest, so he had no reason to hide.

{¶14} At the conclusion of the hearing the trial court ruled from the bench and denied the motion.

B. Jury Trial

{¶15} The case proceeded to a jury trial, which revealed that Shane worked with Anders and in October 2007, they decided to move into a home together on Moxley Road in Bainbridge, Ohio. Shane's family included his wife and two sons, J.D. and D.D. In the winter of 2007-2008, when J.D. was six years old and in kindergarten, he lived at the Bainbridge home.

1. The State's Case

{¶16} J.D. testified that his parents slept in an upstairs bedroom and he and his brother slept in Anders's bedroom on the first floor, although they were supposed to sleep on couches in the living room. According to J.D., he slept in the bed with Anders and his brother slept on the couch in that bedroom.

{¶17} J.D. testified about the following incidents of inappropriate sexual behavior that winter. In the first incident J.D. was playing with Batman and Superman action figures in Anders's bedroom when Anders stuck his penis in J.D.'s mouth for a few minutes. J.D. stopped because it left a "bad taste" and he was choking. Anders then lay on his back on his bed and told J.D. to sit on his penis "like a toilet." Anders put a wet substance on his penis, saying that it might help, and then Anders moved his penis in and out of his butt, for a few minutes. Upon stopping, Anders told J.D. not to tell his father, Shane. J.D. testified that Anders's anal rape hurt and caused him to bleed twice.[4]

{¶18} In the second incident about a week later, Anders drove J.D. around in his car. On the way back home after J.D. told Anders to go faster, Anders stopped the car

---

[4] Although J.D. testified about two separate rapes on this first date, one involving oral intercourse and the other involving anal intercourse, the state eventually submitted the case to the jury on only the anal rape that had occurred that day because it had charged Anders with only three rapes, not four.

in the middle of the road, exposed his penis, put it in J.D.'s mouth, and said "suck on this." After 20 seconds, J.D. stopped because "it tasted nasty."

{¶19} In the third incident about a month or two after the second one, J.D., who was sleeping on the bed in Anders's bedroom, woke up to find Anders sucking his penis. Anders stopped after about a minute, and he told J.D. not to tell his father.

{¶20} Sometime after these incidents occurred, Anders and J.D.'s family moved to separate places. J.D. testified he did not initially disclose these incidents because he was scared. In 2008 or 2009, when Anders, Shane, and J.D. were in the same place, Shane asked J.D. if Anders had ever touched him inappropriately. J.D. said no because Anders was present, causing J.D. to be scared. When he was in fourth-grade, J.D. finally told his mother that Anders had abused him, but she did not tell law enforcement officers about it. In September 2012, J.D. told his cousin, Doug, who told J.D.'s father, Shane, about it. Shane took J.D. to the sheriff's office to report the abuse, and subsequently the Child Protection Center interviewed J.D.

2. The Defense Case

{¶21} Anders testified that he met Shane when they were both working at YUSA. He met the rest of Shane's family when Shane invited Anders over for a cookout. The family was then living in an apartment so Anders and Shane decided to move into a house together to save money. Anders stated that he took the downstairs bedroom and that Shane's family all stayed upstairs. Anders denied that J.D. ever slept in his room. He recalled that sometimes the boys were left at home with him and that he took them fishing and to McDonald's. Anders's parents lived close by, and they sometimes took care of the boys too.

**{¶22}** Anders recalled there was tension over a vehicle trade and it was more severe than Shane described. Anders claimed that it was an "even trade," but that Shane later determined he wanted money in addition to the vehicle. According to Anders the relationship between the two of them soured "quite a bit" and they had a heated discussion over the money issue.

**{¶23}** Anders ultimately left the home because he didn't like being around domestic disputes between Shane and his wife, who argued frequently over money. Life in the house became more chaotic. But leaving the house still did not resolve the situation with the truck, so eventually Anders gave the truck back to Shane to avoid any further issues. However, that didn't stop Shane from continuing to demand money.

**{¶24}** When asked about J.D.'s allegations and testimony, Anders stated unequivocally that none of that story ever happened. He also stated that though he visited with Shane and his family periodically after moving out, Shane never asked Anders whether he had abused J.D.

### 3. The Verdicts

**{¶25}** At the conclusion of the trial the jury returned verdicts finding Anders guilty of all three rapes. The trial court sentenced Anders to an aggregate prison sentence of 30 years to life.

### II. ASSIGNMENTS OF ERROR

**{¶26}** Anders assigns the following errors for our review:

I. JASON'S RIGHT TO A SPEEDY TRIAL WAS VIOLATED WHEN THE STATE WAITED TWO YEARS AND NINE MONTHS AFTER THE INDICTMENT TO ARREST HIM.

II. JASON'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### III. LAW AND ANALYSIS

### A. Constitutional Right to Speedy Trial

**{¶27}** In his first assignment of error Anders asserts that the delay of 33 months between the indictment and his arrest violated his constitutional right to a speedy trial. Anders contests the trial court's denial of his motion to dismiss, which was based on the purported violation of the Sixth Amendment.

**{¶28}** "The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee a criminal defendant the right to a speedy trial." *State v. Doughman*, 2017-Ohio-4253, __ N.E.3d __, ¶ 17 (4th Dist.), citing *State v. Blackburn*, 118 Ohio St.3d163, 2008-Ohio-1823, 887 N.E.3d 319, ¶ 10. The Due Process Clause makes the Sixth Amendment speedy-trial provision applicable to the states. *State v. Spencer*, 2017-Ohio-456, 84 N.E.3d 106, ¶ 29, citing *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

**{¶29}** Appellate review of a trial court's decision on a motion to dismiss for a violation of the speedy trial requirements presents a mixed question of law and fact. *State v. James*, 4th Dist. Ross No. 13CA3393, 2014-Ohio-1702, ¶ 23; *State v. Brown*, 131 Ohio App.3d 387, 391, 722 N.E.2d 594 (4th Dist. 1998). Thus, appellate courts will defer to a trial court's findings of fact as long as competent, credible evidence supports them. *Brown*, 131 Ohio App.3d at 391, 722 N.E.2d 594. Appellate courts then independently determine whether the trial court properly applied the law to the facts. *Id.* When we review the legal issues presented in a speedy trial claim, we must strictly construe the relevant statutes against the state. *Id.*, citing *Brecksville v. Cook*, 75 Ohio St.3d 53, 57, 661 N.E.2d 706, 709 (1996).

**{¶30}** To determine whether a defendant has been deprived of constitutional speedy-trial rights, we must balance four factors:  (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of a speedy-trial right, and (4) prejudice to the defendant.  *State v. Triplett*, 78 Ohio St.3d 566, 568, 679 N.E.2d 290 (1997), citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed2d 101 (1972); *Doughman* at ¶ 18.  None of the factors is per se determinative of the issue; instead, a court considers the factors collectively.  *See Spencer* at ¶ 30, citing *Barker* at 532.  Unfortunately, the Supreme Court's formulation of the *Barker* test compels courts to approach these cases on an ad hoc basis.  *See Vermont v. Brillon*, 556 U.S. 81,91, 129 S.Ct.1283, 173 L.Ed.2d 231 (2009).

**{¶31}** In promulgating its ad hoc balancing test in *Barker*, the Supreme Court gave minimal guidance to courts as to the relative weights to be assigned within and among the four elements.  This minimal guidance has led to inconsistent analyses— straight-balancing and weighted-balancing—and results in resolving constitutional speedy-trial claims.  As one commentator recently stated, "[t]he consequence of the Barker [sic] court's broad language and conflicting ideas has been widely varying application of the *Barker* test.  Yet '[t]he complex nature of the *Barker v. Wingo* balancing test makes it impossible to evaluate the court's results for consistency.'  Commentators have expressed a variety of concerns about how courts misapply the *Barker* factors to the detriment of defendants."  (Footnotes omitted.)  *See* Osnowitz, *Demanding a Speedy Trial:  Re-Evaluating the Assertion Factor in the Barker v. Wingo Test*, 67 Case W.Res.L.Rev. 273, 284 (2016); *see also* Brooks, *A New Speedy Trial Standard for Barker v. Wingo:  Reviving a Constitutional Remedy in an Age of Statutes*,

61 U.Chi.L.Rev. 587 (1994) (proposing a new speedy-trial "motive test," focusing on the reason for trial delays because the straight-balancing and weighted-balancing approaches to the *Barker* test that federal and state courts have adopted "depend on the flawed premise that society and individual defendants have inherently conflicting interests in the speed with which a defendant is brought to trial"); *Billings v. Bruce*, 965 P.2d 866, ¶ 50-54 (Mont.1998), citing Brooks in adopting a new analysis including features of both the straight-balancing and motive tests, overruled in *State v. Ariegwe*, 167 P.3d 815, ¶ 106 (Mont.2007). Despite these flaws in the ad hoc balancing system, precedent from both the United States and Ohio Supreme Courts requires us to forge ahead. *Brillon*, 556 U.S. 81, 91, 129 S.Ct. 1283, 173 L.Ed.2d 231; *State v. Adams*, 144 Ohio St.3d 42, 2015-Ohio- 3954, 945 N.E.3d 127, ¶ 88.

1.  Length of the Delay

{¶32}  "The United States Supreme Court has recognized that the first factor, length of the delay, involves a double inquiry." *State v. Spencer*, 2017-Ohio-456, 84 N.E.3d 106, ¶ 31 (4th Dist.), citing *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). First, an accused must show that the length of the delay was "presumptively prejudicial" to trigger the *Barker* four-part balancing analysis. *Id.* at 651-652. Second, once the *Barker* analysis is triggered, the court must readdress the delay and balance it against the three remaining factors. *Id.* at 652.

{¶33}  Courts generally find post-accusation delay to be presumptively prejudicial enough to trigger the *Barker* analysis when it approaches one year. *Spencer* at ¶ 32, citing *Doggett* at fn. 1. In February 2014, the Ross County Grand Jury secretly indicted

Anders, who was not served with the warrant and arrested until November 2016, i.e., nearly 33 months later. Consistent with our precedent, we find that the 33-month delay between Anders's indictment and his arrest on the warrant was presumptively prejudicial enough to trigger the entire *Barker* analysis.

{¶34} Next we readdress the length of the delay, in conjunction with the other factors. In his brief Anders offers little comment other than to acknowledge the court found the threshold of presumptive prejudice occurred in the 33-month delay between the indictment and his arrest. He does imply that the court didn't give enough weight to the delay when balancing it with the remaining *Barker* factors. In pronouncing its ruling from the bench (there is no subsequent entry in the record memorializing the ruling), the trial court seemed to place the length of the delay somewhere below the level of being egregious, but it is difficult to tell from reading the transcript of the hearing. The court did conclude that the delay was not so long or intolerable as to be outcome determinative by itself. Because Anders's brief focuses upon the length of the delay as it affects whether he needs to affirmatively show actual prejudice, we will do likewise in our review. However, we do note our agreement with the trial court's apparent conclusion that this delay does not reach an egregious level like that in *Doggett*. But the length of the delay does weigh in Anders's favor.

{¶35} Although Anders claims that the trial court erred by not applying the presumption of prejudice associated with the 33-month delay to obliterate the need for an affirmative showing on his part, we reject his claim because presumptive prejudice alone does not establish a speedy-trial violation. Here the trial court considered the length of the delay in its balancing of the pertinent factors. *See State v. Triplett*, 78 Ohio

St.3d at 570, 679 N.E.2d 290, quoting *Doggett* at 656 ("while such presumptive prejudice cannot alone carry a Sixth Amendment claim, 'it is part of the mix of relevant facts, and its importance increases with the length of delay' ").  We will revisit Anders's focus in reviewing the prejudice factor of the analysis.

### 2.  Reason for the Delay

**{¶36}**  Anders claims that the trial court erred by determining the state's negligence was not the reason for the delay.  He argues the trial court's determination of this factor was erroneous because it: attempted to assign blame to him for moving; without any evidentiary support, found that Det. Wheaton did more work than many other officers would have done; and excused the fact that Wheaton failed to do more to follow up the lead about Anders's potential presence in Kentucky.

**{¶37}**  The trial court found that the state was not to "blame" for the delay, i.e., that it did not intentionally or negligently cause the 33-month delay in serving Anders with the warrant on the indictment.[5]  In *Doggett* the Supreme Court of the United States instructed courts subsequently reviewing the second *Barker* factor to afford considerable deference to the trial court's finding on the reason for the delay.  *Doggett* at 652.  Accordingly, we follow that guidance here and conclude competent, credible evidence supports the court's factual finding.

**{¶38}**  Det. Wheaton testified at the hearing on the motion to dismiss that he conducted several LEADS and OLEG checks, searched social media sites, contacted

---

[5] Anders seems to take issue with the trial court apportioning "blame" in its analysis of the issue. However, the Supreme Court of the United States has utilized the term "blame" when addressing the reason for the delay. *See Doggett*, 505 U.S. at 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 ("whether the government or the criminal defendant is more to blame for th[e] delay"), cited with approval in *Brillon*, 556 U.S. at 90, 129 S.Ct. 1283, 173 L.Ed.2d 231.

sheriff's offices and a post office, travelled personally to Mt. Sterling and Washington Courthouse, and talked with J.D.'s father, Shane, in his unsuccessful attempts to locate Anders.

**{¶39}** Although Det. Wheaton acknowledged Shane told him in August 2015 he "heard that" Anders "might" be living somewhere in Kentucky, the trial court reasonably concluded that, "the detective did not have concrete evidence or proof that [Anders] had even gone to Kentucky." Even without more detailed evidence, Det. Wheaton requested a Kentucky LEADS check, continued searching social media sites, and kept contacting Shane.

**{¶40}** Under these circumstances, the trial court's factual finding that the state was not negligent is supported by competent, credible evidence. This is clearly not a case where the sheriff's office stood by idly, doing nothing until a defendant is fortuitously arrested by another agency. The proper question is not whether the state could have done more, but rather whether it did enough to be reasonable, i.e. not negligent. Up to this point the record indicates the state was relatively diligent in its efforts.

**{¶41}** Moreover, even if we assume that the state was negligent in failing to properly follow up on the unverified Kentucky lead, this factor would only weigh slightly in his favor because the Kentucky tip was made in August 2015; any delay attributable to not acting on this new information would account for only 15 months of the 33-month delay. *See Spencer*, 2017-Ohio-456, 84 N.E.3d 106, ¶ 34, quoting *Doggett*, 505 U.S. at 657, 112 S.Ct. 2686, 120 L.Ed.2d 520 (" 'to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than

negligence demonstrably causing prejudice' "). The 15-month delay from Shane's disclosure of the hearsay that Anders might be living somewhere in Kentucky, to the service of the warrant, "was not so protracted or intolerable as to warrant relief absent some particularized trial prejudice." *Spencer* at ¶ 34, citing *State v. Manley*, 4th Dist. Adams No. 97CA637, 1997 W: 451360 (Aug. 6, 1997) (finding that the 29-month delay caused by the state's negligence was not so protracted or intolerable as to warrant relief absent some particularized trial prejudice).

**{¶42}** Affording Anders the benefit of this assumption, we agree with him that this factor weighs in his favor, but not to the extent he claims. This factor weighs minimally for Anders.

### 3. Anders's Assertion of Right to Speedy Trial

**{¶43}** The trial court and the parties agree that Anders timely asserted his constitutional right to a speedy trial by raising it in his motion to dismiss within a month after being arrested. This factor weighs in favor of Anders.

### 4. Prejudice to Anders

**{¶44}** Looking at the prejudice component, we find no evidence in the record that Anders suffered any actual prejudice here. "The three interests that the constitutional speedy-trial right is designed to protect are: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." *State v. Doughman*, 2017-Ohio-4253, __ N.E.3d __, ¶ 23, citing *Barker*, 407 U.S. at 532, 92 S.Ct. 2182, 33 L.Ed.2d 101. Anders was not incarcerated during the post-indictment delay and he suffered no anxiety or concern during this period because he was not aware of the pending charges

raised in the secret indictment.  He did not assert any actual impairment of his trial defense that was attributable to the delay.  In his motion to dismiss he simply claimed he was prejudiced by the delay because neither he nor his family recalled living at the Bainbridge, Ohio house where the rapes occurred.  But he testified at the hearing on the motion to dismiss, as well as at trial, that he lived at that house during the relevant time period.

{¶45}  Nonetheless, Anders argues that the delay was so protracted that a presumption of prejudice relieves him of any duty to affirmatively show actual prejudice.  Even if we credit Anders's claim that Det. Wheaton negligently caused the delay because of his failure to do more to follow up on the Kentucky residence tip, that negligence can only account for 15 months of the post-indictment delay.  That period is not so protracted or intolerable to warrant relief absent some showing of particularized trial prejudice.

{¶46}  Courts generally have found such presumptive prejudice to negate any need for an affirmative showing only in cases where the post-indictment delay lasted *at least five years*.  *See Barker.  See also State v. Stevens*, 3d Dist. Logan No. 8-14-09, 2014-Ohio-4875, ¶ 24, quoting *U.S. v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir.2003); *State v. Rice*, 2015-Ohio-5481, 57 N.E.3d 84, ¶ 29 (1st Dist.).

{¶47}  Similarly, in *State v. Boyd*, 4th Dist. Ross No. 04CA2790, 2005-Ohio-1228, ¶ 15, 17, we held that a 17-month delay between a defendant's indictment and arrest did not violate the defendant's constitutional right to a speedy trial because it "was not so protracted or intolerable as to warrant relief absent some particularized trial prejudice."  In *Boyd* the defendant had no knowledge of the indictment against him, so

he could not have suffered anxiety and concern. Nor did he allege that the delay impaired his ability to defend himself. *See also State v. Bailey*, 2d Dist. Montgomery No. 20764, 2005-Ohio-5506 (17-month delay between indictment and arrest did not violate defendant's constitutional right to a speedy trial because he was unaware of the pending indictment until shortly before his arrest and his claim of prejudice was not credible).

{¶48}    Although Anders cites *Doggett*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520, in support of his claim of presumptive prejudice, that case involved an *8 ½ -year* delay, which is significantly longer than the less than 3-year delay here. The delay in *Doggett* was egregious because it was over six times the 1-year delay necessary for triggering the *Barker* analysis. And for six of the 8 ½ years, the government did practically nothing to find Doggett (it had initially asked a foreign government to "expel" Doggett back to the U.S.). As the *Doggett* court noted, the "tolerance of such negligence varies inversely with its protractedness." *Id.* at 657. Neither the 33-month total delay, nor the 15-month delay assumptively assigned to the scope of the Kentucky search, reach the level necessary to warrant Ander's assertion.

{¶49}  Therefore, the prejudice factor weighs heavily against Anders.

### 5.  Balancing of the Factors

{¶50}  Although the first, second, and third factors weigh in favor of Anders, the second factor weighs only slightly in his favor and fourth factor weighs heavily against him. The minimal weight of the second factor is still not enough to carry the day in the absence of some particularized trial prejudice. After considering the totality of the circumstances, we conclude that the trial court correctly determined that the state did

not violate Anders's constitutional right to a speedy trial.  We overrule Anders's first assignment of error.

### B.  Manifest Weight of the Evidence

**{¶51}**  In his second assignment of error Anders contends that the jury verdicts finding him guilty of three counts of rape were against the manifest weight of the evidence.

### 1. Standard of Review

**{¶52}**  In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving conflicts in the evidence, and created such a manifest miscarriage of justice that we must reverse the conviction.  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.  We are reminded that generally, the weight and credibility of evidence are to be determined by the trier of fact. *See State v. Kirkland*, 140 Ohio St.3d 73, 15 N.E.3d 818, 2014-Ohio-1966, ¶ 132.

### 2. The Victim's Testimony

**{¶53}**  Anders argues that the jury's guilty verdicts were against the manifest weight of the evidence because J.D.'s testimony was inconsistent, unreliable, and incredible.  He cites purported inconsistencies, including:  (1) J.D. testifying that he only rode with Anders once in his car, but Shane testified that J.D. took multiple trips with Anders (2) J.D. and Shane testifying that J.D.'s cousin, Doug, reported the abuse to the police, but two detectives testified that Doug's name is not included in investigative

records; (3) J.D. testifying that he never told his father about the abuse, but later testifying that he did; (4) J.D. testifying that he told his father about the abuse after he told a child-protection worker, when he actually told Shane about it before then; and (5) J.D. testifying that he and his brother slept in Anders's bedroom because they did not want to sleep on the floor, but J.D. later testified that they were supposed to sleep on couches in the living room.  He also argues that J.D.'s testimony was largely uncorroborated, and that potential key witnesses, like the child-protection worker who interviewed J.D. about the abuse, were not called to testify.

{¶54}  J.D.'s testimony was consistent on most of the details of the three rapes— anal intercourse in Anders's bedroom, oral intercourse performed in Anders's car, and oral intercourse performed by Anders in Anders's bedroom.  And Shane corroborated that he had learned about the abuse after J.D. reported the abuse to his ex-wife and to his nephew.  Anders's defense appeared to primarily rely upon the animus between Anders and Shane that resulted from an exchange of their vehicles.  But Shane testified that he remained friends with Anders after they moved from the Bainbridge house, and that they continued to see each other.

{¶55}  " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' "  *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23.  We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.  *Id.*; *State v. Koon*, 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, at ¶ 18.

**{¶56}** The jury was free to credit J.D.'s testimony, which established the three rapes, and to discount Anders's abbreviated denial. Notwithstanding its inconsistencies, J.D.'s testimony is not so incredible as to be unworthy of the jury's acceptance of it. We have reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of witnesses. We conclude that in resolving conflicts in the evidence, the jury did not clearly lose its way and create such a manifest miscarriage of justice that we must reverse the rape convictions. Therefore, we overrule Anders's second assignment of error.

## IV. CONCLUSION

**{¶57}** The trial court properly denied Anders's motion to dismiss, and the jury's verdicts finding him guilty of three rapes are supported by the manifest weight of the evidence. Having overruled Anders's assignments of error, we affirm his convictions and sentence.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J.:   Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment and Opinion as to Assignment of Error II;
                        Concurs in Judgment Only as to Assignment of Error I.

For the Court

BY: _____
     William H. Harsha, Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**